**In re George CHOMAKOS and Nikki Chomakos, Debtors.**

**David W. ALLARD, Jr., Chapter 7 Trustee of the Estate of George Chomakos and Nikki Chomakos, Plaintiff,**

v.

**Flamingo HILTON, Defendant.**

**Bankruptcy No. 90–06595–S.
Adv. No. 91–0762–S.**

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Dec. 21, 1993.

---

Malcolm B. Campbell, Detroit, MI, for plaintiff.

Scott M. Mahoney, Las Vegas, NV, for defendant.

## OPINION

WALTER SHAPERO, Bankruptcy Judge.

*Background and Basic Facts*

On August 2, 1990, Nikki and George Chomakos ("Debtors") filed a voluntary Chapter 11, and on September 6, 1990, an Order for Relief under Chapter 7 was entered. This adversary proceeding was brought by the Trustee against Flamingo Hilton ("Flamingo") under 11 U.S.C. § 548 and Mich.Comp. Laws Ann. §§ 566.11–.23; Mich.Stat.Ann. 26.881–.893 to recover gambling losses sustained by the Debtors at Flamingo.

The Trustee contends that each of the Debtors transferred monies to Flamingo by gambling and received less than reasonably equivalent value in exchange, at a time when the Debtors were insolvent or that by the transfers the Debtors were rendered insolvent.

Flamingo contends that (a) the Trustee cannot sustain his burden of proof that transfers were made by Nikki Chomakos for less than reasonably equivalent value or less than fair consideration because he is not capable of satisfactorily proving whether Nikki Chomakos was a net winner or loser on Flamingo's slot machines; and (b) even if the Trustee could show that Nikki Chomakos was a net loser, the opportunity of winning more than the amount bet and entertainment value of gambling constitute reasonably equivalent value and fair consideration; and (c) even

though George Chomakos appears not to have won anything, the opportunity of winning more than the amount bet and entertainment value of gambling constitute reasonably equivalent value and fair consideration. It is also unclear to Flamingo whether the Debtors were insolvent at the time the transfers were made and/or were rendered insolvent by such transfers.

The parties stipulated to the following facts in the Joint Final Pretrial Order:

(1) On August 2, 1990, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code.

(2) On September 16, 1990, an order for relief under Chapter 7 was entered.

(3) The Trustee is the representative of the bankruptcy estate of the Debtors.

(4) The Trustee has standing to seek recovery of fraudulent transfers pursuant to 11 U.S.C. § 548 and Mich.Comp.Laws Ann. §§ 566.11–566.23.

(5) Nikki Chomakos gambled in Flamingo's casino at its slot machines.

(6) Nikki Chomakos and Flamingo's employees signed Flamingo Hilton's Survey of Certain Gaming Transactions forms whereby Nikki Chomakos declared losses of $3,000 on June 15, 1989, $6,000 on June 16, 1989 and $5,000 on September 11, 1989.

(7) Nikki Chomakos signed W–2G forms declaring winnings of $2,000 on June 15, 1989, $5,000 on June 16, 1989 and $2,000 on September 11, 1989 at Flamingo's slot machines.

(8) George Chomakos lost an estimated $900 on July 1, 1987 gambling at Flamingo.

(9) George Chomakos lost an estimated $100 on November 1, 1987 gambling at Flamingo.

(10) George Chomakos lost an estimated $600 on January 4, 1988 gambling at Flamingo.

(11) George Chomakos lost an estimated $600 on June 20, 1988 gambling at Flamingo.

(12) George Chomakos lost an estimated $1,400 on June 12, 1989 gambling at Flamingo.

(13) George Chomakos lost an estimated $110 on April 29, 1990 gambling at Flamingo.

(14) The Complaint shall be deemed amended to allege and seek the recovery of the following transfers and/or conveyances by George Chomakos to Flamingo for less than reasonably equivalent value at a time when Debtors were insolvent and/or such transfers caused the Debtors to become insolvent:

(a) $900 on July 1, 1987,

(b) $100 on November 1, 1987,

(c) $600 on January 4, 1988,

(d) $600 on June 20, 1989,

(e) $1,400 on June 12, 1989, and

(f) $110 on April 29, 1990.

(15) Defendant is the holder of a nonrestricted gaming license issued by the State of Nevada and Nikki Chomakos' playing of Flamingo's slot machines and George Chomakos' gaming constituted legal transactions in the State of Nevada.

The referred to winnings and losses in tabular form are attached hereto as Exhibit A.

### Law and Discussion

Plaintiff is not specific in its pleadings as to whether it is relying on Bankruptcy Code § 548(a)(1) or § 548(a)(2)(A) and (B). Given the proofs and arguments, however, it is apparent that if Plaintiff is to prevail, it can only do so by relying on § 548(a)(2)(A) and (B)(i) as his Code cause of action.[1] These sections (and the relevant provisions of the analogous Michigan fraudulent conveyance law hereinafter referred to) require no proof of actual intent to hinder, delay or defraud creditors. Rather these sections concern avoidable transfers which are considered to be "constructively" fraudulent when the debtor:

(a) transfers interests within one (1) year of the filing date of September 6, 1990;

(b) is or becomes insolvent on the date of transfer; and

(c) receives less than equivalent value in exchange for the transfer.

These factors comprise the basic elements of required proof under § 548(a)(2)(A) and (B).

It should be likewise noted the Plaintiff is not specific as to which sections of the Michigan Uniform Fraudulent Conveyance Act he is proceeding under—making just a general reference to Mich.Stat.Ann. §§ 26.881–.893/ Mich.Comp.Laws Ann. §§ 566.11–566.23. As was noted in reference to the § 548 action, the proofs and arguments are such that Plaintiff must and can only be relying on Mich.Stat.Ann. § 26.884/Mich.Comp.Laws Ann. § 566.14 (and Mich.Stat.Ann. §§ 26.882; 26.883/Mich.Comp.Laws Ann. §§ 566.12; 566.13 for the definitions of "fair consideration" and "insolvency" terms contained therein).[2]

1. 11 U.S.C. § 548(a)(2)(A) and (B)(i) state,

§ 548. Fraudulent transfers and obligations
(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of filing of the petition, if the debtor voluntarily or involuntarily—

*   *   *   *   *

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

*   *   *   *   *

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

2. Mich.Comp.Laws Ann. 566.14/Mich.Stat.Ann. 26.884 states,

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.
Mich.Comp.Laws Ann. 566.12/Mich.Stat.Ann. § 26.882 states,

(1) A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.
Mich.Comp.Laws Ann. 566.13/Mich.Stat.Ann. § 26.883 states,

*Fair consideration.* Sec. 3. Fair consideration is given for property, or obligation;

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not dis-

The insolvency requirements exist under both statutes. The state statute however does not have the one (1) year limitation contained in the Code. In this case, all of the transfers made by Nikki Chomakos occurred within the one (1) year of the filing. George Chomakos, however, only made one transfer (involving $110) within one (1) year of the filing.

If the Court finds that the transfers were made for less than "reasonably equivalent value" then the Trustee must prove that the Debtors were insolvent. *In re Minnesota Utility Contracting, Inc.*, 101 B.R. 72, 79 (Bankr.D.Minn.1989). The Court will nevertheless discuss the insolvency issue first.

In the case of *In re Otis & Edwards, P.C.*, 115 B.R. 900 (Bankr.E.D.Mich.1990), the court held that the burden of proving lack of insolvency (i.e. solvency) shifts to the transferee if the Trustee proves a lack of fair consideration. *Id.* at 911. That holding on the burden of proof question was premised on the fact it was more onerous for the Trustee to establish the value of the assets and liabilities than the transferee. *Id.* In *Otis & Edwards, P.C.*, the question concerned the value of the transferee's own law practice, and it made sense that the transferee should have to prove its value. Requiring the transferee to prove solvency in this case, a case involving an out-of-state casino, would require the casino-transferee to develop extensive knowledge of the assets and liabilities of the Debtors who, at the time the transactions took place, were strangers to the casino. Therefore, the burden should not shift, and the Trustee should have to prove insolvency.

The Trustee does not appear to be certain when insolvency occurred. The Trustee's view at trial was that the Debtors became insolvent by January 1988. The Trustee's earlier interrogatory answer was that insolvency occurred by November 1988.

The evidence establishes that the Chomakos' were in fact insolvent from at least January 1988. (Pretrial Order p. 15–16.) It is unclear, however, whether the Debtors were insolvent prior to January 1988. Therefore, because the Trustee has the burden of proving insolvency and because he did not prove that the Debtors were insolvent prior to January, 1988, the Debtors should be deemed insolvent as of January, 1988, and thus solvent prior to that time.

Before specifically addressing the remaining issues, this Court must determine how much Nikki and George Chomakos' losses exceeded their winnings in order to determine how much money can be, potentially, recovered. Flamingo does not dispute Nikki Chomakos' indicated winnings of $9,000 as reported to the IRS. Flamingo does dispute, however, that the indicated winnings constitute the full extent of Nikki Chomakos' winnings. Because only jackpots over $1,200 need to be recorded on W–2G forms and because the machines played by Ms. Chomakos offered various jackpots or payouts below $1,200 (Trial transcript, p. 70–71), Flamingo's Mr. Shay asserts that it is very probable that Ms. Chomakos hit several smaller jackpots and walked away with the money. (Trial transcript, p. 71). Therefore, Nikki Chomakos could have winnings totalling much more than the above listed $9,000. Flamingo, however, did not present any evidence or testimony supporting the allegations that Nikki Chomakos won more than $9,000. Therefore, this Court values her winnings at $9,000.

The Trustee alleges Nikki Chomakos sustained losses sufficient to show that she received less than "reasonably equivalent value." The Trustee bases his opinion upon the Survey of Certain Gaming Transaction Sheets which lists losses. These forms are signed by an employee and contain a statement confirming that the employee observed the customer play the game on the date which the debtor claims to have lost the recorded amount. The Surveys listed the indicated losses of $14,000 for Nikki Chomakos. Her net gambling losses were $5,000.

George Chomakos, unlike Nikki Chomakos, has no recorded winnings. George Cho-

proportionately small as compared with the value of the property or obligation obtained.

(MCL § 566.13; CL '29, § 13394.)

makos did, however, lose money at Flamingo. Flamingo's own computer records and admissions demonstrate that George Chomakos suffered gambling losses of $3,710, of which $1,000 were incurred prior to January of 1988 and thus not subject to avoidance. Therefore, George Chomakos' net gambling losses total $2,710 after January of 1988.

Flamingo, however, disputes the amounts the Debtors claimed as gambling losses. Flamingo asserts that the losses are likely to be inaccurate for three reasons. First, the Survey sheets which are provided to customers by Flamingo for reporting losses contain a disclaimer which provides " ... The declaration of loss is by the customer and this establishment does not confirm or verify that information." Therefore, the Survey Forms alone should not be deemed sufficient to establish by a preponderance of the evidence that the Chomakos' sustained gaming losses. Second, customers have a motive to be untruthful since losses are offset against winnings for income tax purposes. Third, the Chomakos' credibility is questionable because Nikki Chomakos admitted that she and her husband face contingent common law and statutory fraud liability for allegedly fraudulent statements made to obtain a loan.

Recognizing the problems of compiling an accurate accounting, it appears likely that the Chomakos' had $9,000 in total winnings and $16,710 in total losses based on the available evidence and testimony. Whether or not the Chomakos net loss of $7,710 should be considered in toto or should be broken down by specific date in order to determine what can be recovered need not be considered at this point.

■ Under § 548, the Trustee may set aside a transfer of the debtor's property if the debtor received less than "reasonably equivalent value" for the property. To set aside a transfer under the cited provisions of the Michigan Uniform Fraudulent Conveyance Act, the Trustee bears the burden of proving the transferors failed to receive "fair consideration". *In re Otis & Edwards, P.C.*, 115 B.R. at 907. Receiving less than "fair consideration" under the Michigan statute is properly considered to be essentially the same as receiving less than "reasonably

equivalent value" under § 548. *Id.* at 908; *In re Bates*, 32 B.R. 40, 41 (Bankr.E.D.Cal. 1983); *In re Curtina Int'l, Inc.*, 23 B.R. 969, 974 (Bankr.S.D.N.Y.1982).

■ Determining whether the debtor received reasonably equivalent value requires two somewhat separate inquiries: (1) was there a receipt of what may properly be considered "value", and if there was, (2) was that value "reasonably equivalent" to what was transferred. (In this case, the Debtors transferred the indicated sums placed in the slot machines and placed on the blackjack tables on the indicated dates.)

■ The cases tend to search for "economic benefit" as the key ingredient of "value". *See In re Ohio Corrugating Co.*, 91 B.R. 430 (Bankr.N.D.Ohio 1988); *In re W.E. Tucker Oil Co., Inc.*, 55 B.R. 78, 81 (Bankr.W.D.Ark. 1985); *In re Cottrill*, 118 B.R. 535 (Bankr. S.D.Ohio 1990). Courts have also considered indirect economic benefit as value. Indirect benefit occurs when the benefit goes directly to a third party with whom the debtor is related. *See e.g. Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981); *In re Consolidated Capital Equities Corp.*, 143 B.R. 80 (Bankr.N.D.Tex.1992).

While not without opposing viewpoints, it would also seem that executory promises (other than promises for support specifically excluded from the definition of value in § 548(d)(2)(A)) constitute value. Whether the receipt of services may further constitute "value" is also disputed. Many courts find that the receipt of services constitutes value. *See e.g. In re Cottrill*, 118 B.R. at 537–538; *In re Universal Clearing House Co.*, 60 B.R. 985, 998 (Bankr.D.Utah 1986); *In re Moses*, 59 B.R. 815, 818 (Bankr.N.D.Ga.1986); *In re Missionary Baptist Foundation of America, Inc.*, 24 B.R. 973, 979 (Bankr.N.D.Tex.1982). It has also been stated that "the requirement of economic benefit to the debtor does not demand consideration that replaces the transferred property with money or something else tangible or leviable that can be sold to satisfy the debtor's creditor's claims." 2 David G. Epstein, et al., *Bankruptcy*, § 6–49, p. 23 (1992).

However, the court in *In re Young,* 148 B.R. 886 (Bankr.D.Minn.1992) aff'd 152 B.R. 939 (D.Minn.1993) found that an exchange of intangibles for money was not a transfer of "reasonably equivalent value." In *Young,* the debtor donated money to his church in exchange for the satisfaction of his moral obligation to tithe and for the use of the services offered by the church. The present case is distinguishable from *Young* because the debtor in *Young* could take advantage of the services the church offered whether or not he contributed while the debtor in the instant case could only gamble if he paid for the right. *See also In re Dondi Financial Corp.,* 119 B.R. 106 (Bankr.N.D.Tex.1990) (fair consideration means substantive value that is reasonable in view of the surrounding circumstances, and/or consideration that is not "so far short of the real value of the property as to startle a correct mind or shock the moral sense.")

Comments referring directly to the Uniform Fraudulent Conveyance Act made in Alces, *Law of Fraudulent Transactions,* § 502(2)(b)(i), p. 5–59 (Warren, Gorham & Lamont 1989) also illustrate the difficulty in determining what constitutes reasonably equivalent value:

> The UFCA definition of fair consideration does not require absolute equivalence between the property the grantor gives up and what he receives in return; there is room for some inequality, hence, the "fair" equivalence standard. The purpose for the flexibility in the definition is to assure that fraudulent disposition law will not have too great a chilling effect on commercial transactions. Absolute equivalence would be difficult to establish, and recognizing the integrity of transactions when there is less than absolute equivalence but still a fair equivalence provides an accommodation of the interests implicated, a balance between the need to permit transactors to make deals, some good and some not so good, and the need to fix a point beyond which courts will not permit grantors to enter into transactions that will too profoundly impair their ability to discharge obligations to creditors.

To capture and apply the spirit of the fair equivalence standard, the courts have developed a catalog of tests by which the equivalence is to be measured to determine whether it is fair. The tests focus on ways to balance prejudice to the grantor's creditors against society's interest in maintaining the integrity of commercial transactions (citing cases).

The ramifications of the foregoing will become clearer after a review of other authorities on the subject, in relation to the facts in this case.

In terms of the overall inquiry, case law presents no specific test for determining whether "reasonably equivalent value" is exchanged. *In re Morris Communications NC, Inc.,* 914 F.2d 458, 466 (4th Cir.1990) ("the courts have considered a number of standards to be applied" in determining the meaning of "reasonably equivalent value.") Older case law defining "reasonably equivalent value" applies a mathematical formula as a benchmark for such determination, establishing specific guidelines for what is and what is not "reasonably equivalent value." *Durrett v. Washington Nat'l Ins. Co.,* 621 F.2d 201 (5th Cir.1980) (any transfer for less than 70% of market value of the property is per se not reasonably equivalent value). This rigid test has been rejected by most courts. *In re Bundles,* 856 F.2d 815, 823–24 (7th Cir.1988).

Even if this Court applied the mathematical test, Nikki Chomakos may still have received reasonable equivalent value. Considering what Nikki Chomakos won on June 15 and June 16, 1989 (and considering the two-days activities to be a single transaction) in relation to what she expended, she received in excess of seventy (70%) percent of the value she transferred which, without realizing any other consideration received, is well within the seventy (70%) percent rule above noted and applied by some courts in determining reasonable adequacy.

As to the seventy-percent rule, it has been noted:

> Yet, the 70 percentage figure is not mechanically controlling in any kind of case. Reasonable equivalence may be lacking when more than 70% is paid, and may be

present when the debtor gets less than 70% of the transferred property's value. Moreover, the percentage paid, though very important, is not itself always controlling. Rather, it is properly considered in combination with all of the other facts surrounding the transfer in determining the ultimate issue which is whether, in light of the particular circumstances of the case, the debtor got a fair economic exchange.

2 Epstein, et al., *Bankruptcy*, § 6-49, p. 37.

█ The trend followed by many of the circuit courts in their more recent decisions is to consider all of the facts of a case in order to determine if reasonably equivalent value is given in exchange for a transfer. *See In re Morris Communications NC, Inc.,* 914 F.2d at 467.[3] The *Morris* court stated, specifically,

> Factors to be considered include the good faith of the transferee, the relation differences in the amount paid compared to the fair market value, and the percentage of the amount paid is of the fair market value ... [and] whether the sale was an arm's length transaction between a willing buyer and a willing seller.

*Id.*

The Trustee rejects any test based on a fact specific analysis inquiry and, instead, argues for the application of a narrower view involving two tests for determining whether the exchange was for "reasonably equivalent value." The first requires viewing the adequacy of consideration primarily from the creditors' standpoint. *In re Anderson Industries, Inc.,* 55 B.R. 922, 927 (Bankr. W.D.Mich.1985); *In re Dondi Financial Corp.,* 119 B.R. 106 (Bankr.N.D.Tex.1990); *McCaslin v. Schouten,* 294 Mich. 180, 186, 292 N.W. 696, 699 (1940).

Accepting the concept that the transactions in question should be considered from the creditor's standpoint does not perforce require acceptance of the Trustee's position. Actually, when one considers the periods of time involved, viewing each of the transac-

tions separately and noting the periods over which they occurred in light of both the winnings and the magnitude of the amounts bet and the losses incurred on each separate occasion, a fair argument can be made that the direct and indirect receipts could amount to fair or adequate consideration which does not "startle the correct mind nor shock the moral sense." *In re Dondi Financial Corp.,* 119 B.R. at 109. More importantly the *quid pro quo* was established in the context of a state regulated business, existing in an open, competitive marketplace responding and responsive to desires of legitimate tourists pursuing and engaging in a legal and legitimate pursuit. Indeed, one could fairly argue that in such circumstances the "fairness" or "reasonable equivalence" requirements ought to be considered as perforce satisfied. In the end, however one must concede that the lack of a more quantifiable "economic benefit" may be the strongest link in the Trustee's argumentative chain in this case—but the strength of the other links must be considered as well.

Viewing the adequacy of consideration primarily from the creditors' standpoint is a problematic test for at least two reasons. First, various creditors may have different ideas about what constitutes adequate consideration. For example, low priority unsecured creditors who are expecting little from the bankruptcy estate may want the debtor to take more risks to earn money than creditors with a higher priority. Second, consideration can exist even if debtors expend money in ways which do not benefit creditors. For instance, if the debtors treated themselves to $250 meals each day for a month, their estate would be depleted by $7,000 but consideration would still be present.

The second test the Trustee advocates, the balance sheet test, requires that "the value of the benefit received by the debtor approximate the value of the property or obligation he has given up." *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d at 994; *In re Rodriguez,* 895 F.2d 725 (11th Cir.1990); *In re Butcher,* 58 B.R. 128 (Bankr.E.D.Tenn.

---

**3.** *See also, In re Bundles,* 856 F.2d at 824; *In re McConnell,* 934 F.2d 662 (5th Cir.1991) (court does not state rule of law but considers all of the facts surrounding the transfer.); *In re Otis & Edwards, P.C.,* 115 B.R. at 909–910; *In re Young,* 152 B.R. at 945.

1986); *Minnesota Utility Contracting, Inc.,* 101 B.R. 72 (Bankr.D.Minn.1989) *aff'd in part, rev'd in part on other grounds, In re Minnesota Utility Contracting Inc.,* 110 B.R. 414 (Bankr.D.Minn.1990). This test has been applied primarily in cases where tangible goods have been exchanged. However, in cases where intangible benefits are gained, such as the potential to earn more money than expended, the balance sheet test has not been used. *See, In re Morris Communications NC, Inc.,* 914 F.2d 458 (4th Cir.1990).

It is indeed difficult to reconcile the following statements on the one hand, (1) the questioned transaction must be looked at from the point of view of the creditor, (2) the basic question is whether or not the transactions rendered the transferor "judgment proof", or (3) what should be emphasized is what the Debtor obtained, not what the transferee gave up, with the more expansive views hereinbefore referred to on the other hand. At one level, these seemingly contradictory tests can be reconciled by pointing to the fact, true in many cases, that the narrower views were set forth in factual situations where the result seemed obvious such as where an individual transferor transforms individually held property into entireties property thus putting it beyond the reach of creditors with literally no benefit as such accruing to the transferor other than to place property beyond the reach of creditors. This Court believes that, in this case, the proper perspective is that which tries to take into account all of the facts.

Accepting the totality of the circumstances test requires consideration of factors set forth in the cited *Morris Communications* and *Otis & Edwards, P.C.* cases, as well as other relevant considerations to be noted.

### (i) Were the transactions conducted at arms-length?

■ The Trustee argues that the gambling transactions were not at arms-length

because the Chomakos' did not occupy an equal bargaining position with Flamingo because Flamingo alone set the pay-back percentage and the rate at which a gambler was expected to lose money. This Court finds that an "arms length" transaction does not require equality of bargaining power (if that could ever be measured in any meaningful way). Rather it involves (a) actions of essentially unrelated willing parties, each being relatively free to act in what each perceives to be his or her own self-interest, (b) actions which are voluntary (as opposed to being under compulsion or duress), and (c) actions which generally take place in an open market. Black's Law Dictionary 57 (5th ed. 1983). The Debtors understood the type of transaction which occurs at a casino and voluntarily placed bets and played the slot machines. No proof has been offered that Debtors were acting under duress or were in some way deprived of their free will to the point where the principles of general contract law would permit them to avoid their transactions on those grounds. The activities involved took place in an essentially open market place, and the perceived self-interest of each of the parties obviously drove their participation and involvement. Therefore, this Court concludes that the gaming transactions occurring between the Debtors and Flamingo were conducted at arms-length.

### (ii) Was property or value transferred to the debtor?

■ Gambling is, arguably, an "investment" that can have economic value, albeit one that may entail what many view as an unacceptably high risk. The Debtors received the chance to win more money than they wagered.[4] They also received whatever psychic and other intangible values are attendant to being at Flamingo's establishment and gambling.

The Fourth Circuit in the *In re Morris Communications NC, Inc.* case was present-

---

4. For example, at blackjack, the gambler has a chance to win $1.00 for every $1.00 wagered, or to win $1.50 for every $1.00 wagered for a hand of "blackjack". (Trial transcript, p. 57–58). On slot machines, players can win substantial jackpots, potentially millions of dollars, on a $3.00 investment (Trial transcript, p. 61). On two of the three machines which Hilton can identify Ms. Chomakos as having played based on her W–2G forms, the player could win as much as $8,000 on a $10.00 wager, and on the third machine, the player could win as much as $5,000 on a $15.00 wager.

ed with the question as to how a court should quantify the value of a risky investment. In *Morris*, the property in question was a 26% stock interest in a corporation whose sole asset was a cellular telephone license application. *Id.* at 460. At the time of the transfer, the application had no present value; "it was merely a right to participate along with 21 other applicants in the award of the non-wireline cellular license for the Charlotte–Gastonia SMSA through the 'rolling of the dice' in a lottery." *Id.* at 468. The court in *Morris* did not focus on whether a lottery chance had any value, but instead concentrated on determining the fair market value of the chance. *Id.* at 460. In other words, the court held that risky investments can have economic value but left courts with the task of determining the extent of that value.

### (iii) Whether the debtor received additional valuable benefits as a result of the transaction?

Debtors arguably received additional valuable benefits as a result of the transaction in the form of entertainment value, i.e.: the Debtors apparently enjoyed the excitement of gambling at the Flamingo.

■ The Trustee has two counter arguments. The first is based on the "creditors' standpoint" and "balance sheet" tests for determining "reasonably equivalent value." Since this court has rejected those tests, the Trustee's arguments based on those tests fail, too.[5] Second, the Trustee argues, that because Flamingo has a house advantage on blackjack and retains a percentage of the money deposited in its slot machines, the 'chance' to win money actually represents an expectation of losing money and has no economic value. The second argument is also unpersuasive in light of the fact that gambling is a legal and regulated industry.

Flamingo's argument is that Debtors received additional valuable benefits as a result of the transaction in the form of entertainment value. The Debtors' entertainment options are broadened by taking a Las Vegas vacation because gambling revenues subsidize other items such as:

(a) relatively inexpensive hotel rooms ($50–$52 per night);

(b) Broadway quality shows at ticket prices of $18 (as compared to a $65 or $100 price in New York);

(c) inexpensive lavish food buffets;

(d) available shopping;

(e) various and sundry tours and opportunities to participate in golf, swimming, skiing and other sports and sightseeing in the area; and

(f) last but not least, of course, the "opportunity" to gamble and make money doing so.

However, a problem with this argument is that both the gambler and non-gambler can receive those other things, so in that sense the Debtors did not receive anything in Las Vegas that they would not have received had they not gambled.

### (iv) Did "good faith" exist in the transactions involved?

■ The concept of good faith is specifically part of the inquiry under Michigan law. *See* Mich.Comp.Laws Ann. § 566.13; Mich.Stat.Ann. § 26.883. The *Morris* court explicitly considered it as likewise and necessarily involved in an inquiry under § 548. The primary orientation on this point is whether the *transferee* knowingly participated in acts or as part of a plan to hinder or defraud creditors. A "yes" answer would be yet another reason to avoid the transaction. A "no" answer should be a factor for not doing so. There is no proof here that Flamingo had any knowledge of what the Debtors' financial situation might have been at the various times the gambling occurred. It is unwarranted to indulge in any presumption that all persons who gamble in Las Vegas

5. The Trustee argues that the debtor received no property rights or tangible assets or rights to benefit the creditors referring to principles recited in such cases as, *In re Young,* 152 B.R. 939 (D.Minn.1993) (debtors did not receive reasonably equivalent value for their voluntary church contributions) and *In re Dondi Financial Corp.,* 119 B.R. 106 (Bankr.N.D.Tex.1990) ("what constitutes a fair consideration under the Uniform Fraudulent Conveyance Act must be determined from the standpoint of creditors ... whether the debtor's estate has been unfairly diminished by his conveyance").

are, or are thereby rendered, insolvent or intend to defraud their creditors (and from that conclude that the casinos are perforce knowing participants in a scheme to defraud). The fact that Debtors continued to gamble and/or returned for future visits cannot be considered a sufficient basis for a finding of collusive participation in any scheme to avoid Debtors' creditors. What Flamingo received from Debtors was not measurably beyond the consequences of Debtors' natural relationship with Flamingo nor did Flamingo receive or obtain some greater advantage for itself, above and beyond that which naturally results from that relationship. For better or for worse, Flamingo was acting in its customary way consistent with the business it was in.[6] There is insufficient evidence that the Debtors gambling activities involved such amounts or were engaged in with such frequency as would support a conclusion that Flamingo was acting in bad faith. Therefore, whatever one might think of Flamingo's business or its patrons, one must conclude it was acting in good faith in this situation, even granting that in one sense it is in the business of exploiting what some might consider human weaknesses with a possible result that potentially bodes ill for the creditors of some of its many patrons.

### Conclusion

As is obvious, the facts of this case do not fit the usual mold of fraudulent conveyance cases. From the point of view of creditors, a debtor who spends money gambling is in essence making what is for all intents and purposes a gift to whomever profits by the establishment's operation in order to satisfy the debtors essentially non-economic psychological desire(s) and for which the debtor receives nothing the law should recognize as being of any cognizable (let alone "fair") value. Rather, the argument goes, the emphasis should be on the net effect on the debtors' assets available to satisfy creditors' claims. On the other hand, this case is no different from the debtors taking their family to a posh (and arguably overpriced) non-gambling resort where they spend many thousands of dollars over a short period of time on room, food, entertainment, golf, excursions, etc. (and one of those trips may have immediately preceded the bankruptcy filing). In such instances, while there was a *quid pro quo*, surely it was not an "economic" benefit to the Debtor-transferor. (Indeed, in one sense there is a greater potential "economic" benefit realizable in gambling than in spending that same money on an expensive vacation.) What appears to be more important is that it was an arms-length ordinary course of "business" type of activity being engaged in by both transferor and transferee, or if not ordinary course, it involved a not uncommon activity which cannot be considered so abnormal, unforeseeable or outrageous as to require a different result. As was noted in the cases involving contributions to churches, while no fraudulent intent as such existed, it was also true that no so-called "badges of fraud" existed either. Gambling was and is a legal and regulated business in Nevada. Legal and regulated gambling is spreading across the country in various forms and shows signs of being more and more pervasive as its potential for profit to private enterprise and governments, becomes more apparent. It is also available in free standing forms which are not directly involved with a hotel or similar establishment that also offers food, entertainment and other amenities. Much money is also being spent by vast numbers of the public in state lotteries. Indeed it is possible, even likely, that the money spent and lost in those lotteries is relatively greater (when measured against the individual lottery players' income, assets, liabilities or net worth) then the money lost in this case. Should state lotteries operate at the risk of being recipients of fraudulent conveyances? To conclude that Flamingo is liable in this case would be, in this Court's view, to conclude that each casino and lottery operator (and maybe even the above-mentioned resort) is in reality a protector of the creditors of its customers, to the point that to protect themselves they must continuously

---

6. *See Downing v. Brooks,* 194 Mich. 490, 493, 160 N.W. 543, 544 (1916) where in a different factual context the court adopted the lower court's opinion, which referred to the fact that the transferee "was acting in the customary way and in line with its business."

inquire and be sufficiently knowledgeable as to the financial circumstances of each of its patrons so that they can, in light of the knowledge thus obtained, refuse access to certain of those patrons. As a general proposition, that would tip the scales inordinately in favor of creditors and do excessive harm to society's interest in maintaining the integrity of legal and commercial transactions and thereby do violence to the real intent and concepts underlying § 548 and the Michigan Fraudulent Conveyance Act. This Court is unaware of any pervasive statutory or public interest requirement in fraudulent conveyance cases that a transferee should be considered as the transferor's creditors keeper.

The foregoing is stated with particular attention to the facts of this case: i.e. that one debtor while incurring a net loss had substantial winnings from gambling which occurred on two separate occasions, fifteen and twelve months prior to the bankruptcy filing, and, the other debtor's questioned gambling losses took place on six separate occasions during a thirty-eight month period prior to the bankruptcy filing date.

One could readily conjure up a situation where a "high roller", whose financial situation is well known, gambles at a casino one or two times shortly before filing bankruptcy and loses an inordinately large amount of money. That factual situation, or something much more akin to it then this one, contains the seeds of a possibly different result. By concluding in this case that the relief requested should be denied, this Court does not thereby intend to insulate as a matter of law all legal gambling transactions from the reach of creditors.

The Court's conclusion is therefore that the relief requested should be denied because, when weighed in their totality, the facts and circumstances of this case (and regardless of, and without resting the decision on any failure of any party to meet its particular burden of proof) dictate such a result.

Flamingo shall prepare an order consistent with this Opinion.

EXHIBIT A

Gambling Losses and Winnings
(Bankruptcy Ch. 7 Order for Relief Date—9/6/90)

Nikki Chomakos

| Date(s) | Amounts Gambled | Winnings | Net Winnings/(Losses) |
|---|---|---|---|
| 6/15/89 | $3,000 | $2,000 | ($1,000) |
| 6/16/89 | $6,000 | $5,000 | ($1,000) |
| 9/11/89 | $5,000 | $2,000 | ($3,000) |
| Sub-total(s) | $14,000 | $9,000 | ($5,000) |

George Chomakos

| Date(s) | Amounts Gambled | Winnings | Net Winnings/(Losses) |
|---|---|---|---|
| 7/1/87 | $ 900 | —0— | ($ 900) |
| 11/1/87 | $ 100 | —0— | ($ 100) |
| 1/4/88 | $ 600 | —0— | ($ 600) |
| 6/20/88 | $ 600 | —0— | ($ 600) |
| 6/12/89 | $1,400 | —0— | ($1,400) |
| 4/29/90 | $ 110 | —0— | ($ 110) |
| Sub-total(s) | $3,710 | | ($3,710) |