*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STEPHEN SWIRPLE, JEANNETTE HIXSON, RICHARD SMITH, DEAN LIGUORI, LYNN OLIVIER, JULIE VARCHETTI, DON DECLERQ, KIM BASHA, TAMARA GIRLING, LYNNMARIE MANGO, WEB EQUITY HOLDINGS, LLC, and JRV HOLDINGS, LLC,

Plaintiffs-Appellants,

v

MGM GRAND DETROIT, LLC,

Defendant-Appellee.

UNPUBLISHED
February 4, 2020

No. 345284
Wayne Circuit Court
LC No. 17-010953-CZ

Before: BECKERING, P.J., and CAVANAGH and STEPHENS, JJ.

PER CURIAM.

Plaintiffs are a group of individuals and limited liability companies victimized by nonparty Gino Accettola, who defrauded them of money they gave him to invest in construction projects. Rather than a calculated rolling of the dice on construction investments, Accettola tried his hand at blackjack, losing plaintiffs' money at the gambling tables owned by defendant, MGM Grand Detroit, LLC. Plaintiffs are seeking to recover their money from defendant pursuant to the Uniform Voidable Transactions Act (UVTA), MCL 566.31 *et seq*.[1] The trial court granted defendant's motion for summary disposition and dismissed the case. Plaintiffs appeal as of right, and we affirm.

---

[1] This act was formerly known as the Michigan Uniform Fraudulent Transfer Act (MUFTA), MCL 566.31 *et seq*., which was amended by 2016 PA 552, effective April 10, 2017. Among other changes, the amendment changed the short title of the act to the "Uniform Voidable Transactions Act." The relevant provisions of the UVTA at issue on appeal have not significantly changed from previous versions of the act.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiffs are investors who loaned substantial sums of money to Accettola beginning in 2014 for Accettola to invest in constructions projects in Michigan and Florida. When plaintiffs learned there were no such construction projects, they sued Accettola in 2016 for fraud and similar claims and obtained a judgment against him. While attempting to collect, plaintiffs learned that Accettola did not have any assets or lawful income, and Accettola admitted in an affidavit that he had gambled away the money plaintiffs gave him at defendant's casino. Plaintiffs filed the underlying complaint against defendant in 2017 to recover some or all their money. At issue in this appeal are counts 3 and 4 of plaintiffs' complaint, in which plaintiffs alleged that Accettola's transfers of money to defendant's casino are voidable pursuant to MCL 556.134(1)(a) and MCL 556.35(1) of the UVTA.

It is undisputed that Accettola made multiple large deposits of cash with defendant to fund his account at the casino. Plaintiffs contended in the trial court that although Accettola was a customer at defendant's casino before 2014, records showed that his gambling activity increased precipitously once the fraud began in 2014. Plaintiffs submitted evidence that they argued showed that as Accettola's gambling activity increased, defendant offered Accettola the opportunity to gamble using markers. In conjunction with this offering, Accettola completed a customer credit agreement that allowed defendant to perform a background check on him. According to plaintiffs, a background check would have revealed that Accettola had no employment or other source for the millions he used to gamble at defendant's casino. It also would have revealed that he had a criminal history involving identity theft and larceny by conversion, among other crimes, and that he had served significant time in prison. Plaintiffs alleged that defendant continued to extend credit to Accettola even though it knew or should have known that he was using funds procured by fraud, rather than by legitimate means, to fund his gambling habit. Plaintiffs further alleged that while Accettola was perpetrating the fraud and gambling away their money, defendant facilitated Accettola's gambling addiction by pampering him with free or discounted rooms at its hotels, as well as gifts and meals.

In response to the complaint, defendant filed an answer with affirmative defenses and a motion for moved for summary disposition pursuant to MCR 2.116(C)(8) (failure to state a claim) and (C)(10) (no genuine issue of material fact).[2] The trial court denied the motion because the parties had not yet completed discovery. Upon the completion of discovery, defendant renewed its motion for summary disposition, arguing in part that dismissal of plaintiff's fraudulent transfer claims was proper because it had received Accettola's gambling wagers in good faith and for reasonably equivalent value. In opposition, plaintiffs argued that summary disposition of their actual fraud claim under MCL 566.34(1)(a) was improper because they presented evidence creating a genuine issue of material fact as to whether Accettola transferred money to the casino with an actual intent to defraud them. They further claimed that summary disposition of their constructive fraud claim under MCL 566.35(1) was improper because they presented evidence creating a genuine issue of material fact as to whether Accettola actually received reasonably

---

[2] Plaintiffs had apparently subpoenaed and obtained records from defendant, as a non-party, in the lawsuit against Accettola.

equivalent value for his wagers, given that defendant enjoyed a greater than normal house advantage with respect Accettola. Put simply, Accettola was a terrible gambler. And knowing this, defendant took measures to facilitate his gambling. Based on this same evidence, plaintiffs filed a motion for partial summary disposition in its favor with respect to defendant's 17th affirmative defense, wherein defendant claimed that Accettola received reasonably equivalent value in exchange for his gaming transactions with defendant.

As noted above, defendant prevailed in the trial court.[3] The trial court concluded that, among other things, defendant had received Accettola's transfers of money in exchange for markers and his ensuing wagers in good faith, and it provided reasonably equivalent value in exchange. This appeal followed.

## II. ANALYSIS

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Spiek v Dep't of Transp,* 456 Mich 331, 337; 572 NW2d 201 (1998). Defendant moved for summary disposition under MCR 2.116(C)(8) and (C)(10). The trial court did not specify under which court rule it granted defendant's motion, but it clearly considered evidence outside the pleadings. Under such circumstances, this Court reviews the decision as though made under MCR 2.116(C)(10). *Cuddington v United Health Servs, Inc,* 298 Mich App 264, 270; 826 NW2d 519 (2012).

A motion under MCR 2.116(C)(10) tests the factual support for a claim. A court must consider the pleadings, affidavits, depositions, admissions, and any other documentary evidence submitted by the parties, and view that evidence in the light most favorable to the nonmoving party to determine if a genuine issue of material fact exists. MCR 2.116(G)(5); *Maiden v Rozwood,* 461 Mich 109, 118-120; 597 NW2d 817 (1999). The trial court should grant summary disposition if, except as to the amount of damages, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Babula v Robertson,* 212 Mich App 45, 48; 536 NW2d 834 (1995). A court may not assess credibility or determine disputed facts when deciding a motion for summary disposition. *Skinner v Square D Co,* 445 Mich 153, 161; 516 NW2d 475 (1994), overruled in part on other grounds in *Smith v Globe Life Ins Co,* 460 Mich 446, 455 n 2; 597 NW2d 28 (1999).

Michigan law defines two types of fraudulent transfers. One focuses on the transferor's actual intent, and the other focuses on the economic realities of a transfer, or constructive fraud. *Dillard v Schlussel,* 308 Mich App 429, 446; 865 NW2d 648 (2014).

> The first encompasses transfers made "[w]ith actual intent to hinder, delay, or defraud" a creditor and applies to transfers made either before or after the creditor's claim arose. MCL 566.34(1)(a). The second, commonly called "fraud in law" or constructive fraud, deems certain transactions fraudulent regardless of the

---

[3] Based on its grant of defendant's motion for summary disposition, the trial court determined that it need not rule on plaintiffs' motion for summary disposition regarding defendant's 17th affirmative defense. The trial court's other rulings are not at issue on appeal.

creditor's ability to prove the debtor's actual intent. It applies only to transfers made after the creditor's claim arose. Three elements of proof are required: (1) the creditor's claim arose before the transfer, (2) the debtor was insolvent or became insolvent as a result of the transfer, and (3) the debtor did not receive "reasonably equivalent value in exchange for the transfer . . . ." MCL 566.35(1). [*Id*. at 446-447.]

Plaintiffs allege both types of fraud.

## A. ACTUAL INTENT

Plaintiff's claim for actual fraud is governed by MCL 566.34(1)(a), which allows a creditor to void a transfer of property made by a debtor if the debtor made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor . . . ." Because debtors do not generally announce their intent to defraud, MCL 566.34(2) provides as follows a means of determining the transferring debtor's intent:

(2) In determining actual intent under subsection (1)(a) or (4), consideration may be given, among other factors, to whether 1 or more of the following occurred:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all of the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor. [MCL 566.34(1)(a), (2).]

These subsections list so-called "badges of fraud," i.e., "circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." See *Dillard*, 308 Mich App at 449, quoting *In re Triple S Restaurants, Inc*, 422 F3d 405, 414 (CA 6, 2005) (quotation marks and citations omitted).

> Badges of fraud are not conclusive, but are more or less strong or weak according to their nature and the number concurring in the same case, and may be overcome by evidence establishing the *bona fides* of the transaction. However, a concurrence of several badges will always make out a strong case. [*Dillard*, 308 Mich App at 449, quoting *Bentley v Caille*, 289 Mich 74, 78; 286 NW 163 (1939) (quotation marks and citation omitted).]

Plaintiffs argue that the trial court erred in granting defendant's motion for summary disposition under MCR 2.116(C)(10) because plaintiffs presented evidence of multiple badges of fraud, i.e., (c), (d), (e), (g), (h), and (i), thus creating a question of fact for a jury as to Accettola's actual intent. Plaintiffs further contend that the trial court erred by reasoning that they are unable to establish Accettola's actual intent to defraud because they failed "to adequately show that Accettola had a desire to lose when wagering at [defendant's casino]."

We agree that Accettola's desire to win or lose at wagering was not relevant to establishing his actual intent to defraud plaintiffs under MCL 566.34. However, the trial court granted defendant's motion with respect to plaintiffs' actual fraud claim on grounds that "Accettola received a 'reasonably equivalent value' in exchange for each transfer made at MGM" and that "MGM received payment by Accettola in good faith." See MCL 566.38(1).

MCL 566.38(1) provides that "[a] transfer or obligation is not voidable under section 4(1)(a) against a person that took in good faith and for a reasonably equivalent value given the debtor or against any subsequent transferee or obligee." Assuming without deciding that plaintiffs presented evidence of several badges of fraud, summary disposition was nevertheless proper if there are no factual disputes that defendant took Accettola's transfers of money in good faith and for a reasonably equivalent value given in return. Defendant had the burden to establish the applicability of MCL 566.38(1) by a preponderance of the evidence. MCL 566.38(7)(a) and (8).

Plaintiffs argue that defendant is not entitled to summary disposition under MCL 566.38(1) because it did not raise that specific statute as an affirmative defense. We disagree. In its affirmative defenses, defendant alleged that it lacked actual knowledge that the money was "fraudulently stole[n]" by Accettola, that it provided reasonably equivalent value, and that it acted in good faith. Defendant relied expressly on MCL 566.38(1) as a complete defense in its initial motion and supporting brief for summary disposition, in its reply to plaintiffs' brief in opposition to its motion for summary disposition, and in its renewed motion and supporting brief for summary disposition. Moreover, at oral argument on the renewed motion, defendant contended that it was entitled to summary disposition based on MCL 566.38(1). On this record, we conclude that plaintiffs had adequate notice that defendant intended to rely on the defense provided by MCL 566.38(1).

Plaintiffs further argue that, even if defendant did provide notice of its reliance on MCL 566.38(1), that section provides " 'an obstacle to avoidance of transfers,' " not a defense to a claim

brought under MCL 566.34(1)(a). In support of this assertion, plaintiffs rely on *Dillard*, 308 Mich App at 454-455. However, plaintiffs misrepresent *Dillard* on this point. The cited statement in *Dillard* pertains to the general principle that, alone, a debtor's receipt of reasonably equivalent value for a transfer does not cleanse transfers of their fraud, and to the Court's specific rejection of the defendants' argument that transferred assets used to pay reasonable, ordinary household expenses were exempt from claims brought under MCL 566.34(1)(a) and MCL 566.35(1). A transfer for which a debtor receives reasonably equivalent value, MCL 566.34(2)(h), may nevertheless exhibit other badges of fraud sufficient to raise an issue of fact regarding the debtor's intent. However, when a transferee receives in good faith *and* for reasonable equivalent value, MCL 566.38(1) provides a defense against claims brought under MCL 566.34(1). As this Court explained in *Dillard*,

> [T]ransferees who have exchanged reasonably equivalent value for a transfer are protected from the avoidance remedy—they can keep that which they paid for. This makes good sense. If [the co-defendant] exchanged his law firm check for a car, the dealer who sold him the vehicle would not be subject to avoidance of the transfer, because the dealer gave value in exchange. In other words, the MUFTA[4] protects good faith purchasers for value. [*Id*. at 456.]

We conclude from our review of the record that a preponderance of the undisputed evidence established the elements of MCL 566.38(1) and, thus, warranted the trial court's grant of summary disposition to defendant pursuant to MCR 2.116(C)(10).

## 1. GOOD FAITH

The primary orientation with regard to "good faith" is whether defendant "knowingly participated in acts or as part of a plan to hinder or defraud [plaintiffs]. *In re Chomakos*, 170 BR 585, 594 (Bankr ED Mich, 1993).[5] A preponderance of the record evidence shows that it did not. See MCL 566.38(7)(a).

---

[4] See note 1.

[5] The decisions of lower federal courts, which includes bankruptcy courts, are not binding on state courts, but they may be persuasive. *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004). In *Chomakos*, a Chapter 7 trustee filed an adversary proceeding against a casino to recover as fraudulent transfers the debtors' pre-petition losses under 11 USC § 548(a) and (B)(i) and the relevant provision of Michigan's fraudulent conveyance law at the time, MCL 566.14. At the time, the bankruptcy statute authorized a trustee to avoid as "constructively" fraudulent transfers made by the debtor within one year of the debtor's application for bankruptcy, for which the debtor did not receive reasonably equivalent value, and at the time of which the debtor was or became insolvent. The relevant Michigan statute deemed as fraudulent a conveyance by a debtor who was or became insolvent at the time of the conveyance, unless the conveyance was made for fair consideration. In his analysis, the bankruptcy judge discussed both "good faith" and "reasonably equivalent value" as they related to the facts of the case and the statutory requirements.

Records submitted by plaintiffs show that Accettola was an inveterate gambler who had frequented defendant's casino several times a week for years before any of the plaintiffs gave him any funds to invest. Defendant attached to its renewed motion for summary disposition an affidavit from Director of Cage Operations, Sheila Mott, in which she averred that the casino never extended credit to Accettola and that he gambled with money he brought to the casino himself (i.e., "front money"). Defendant asserts that, because it did not extend credit to Accettola, it was under no obligation to run a credit or background check on him or to investigate the source of his funds. Plaintiffs provide no contrary evidence nor cite contrary authority. Defendant also attached to its renewed motion for summary disposition plaintiffs' answers to defendant's first set of interrogatories showing that all the plaintiffs admitted that, prior to filing their complaint against Accettola in November 2016, they did not tell anyone that Accettola had defrauded them. Thus, there is no evidence that defendant had, or should have had, knowledge of Accettola's financial situation at the time he gambled or should have known the alleged source of the funds with which he gambled. As the court stated in *Chomakos*, 170 BR at 595, "[i]t is unwarranted to indulge in any presumption that all persons who gamble . . . intend to defraud their creditors (and from that conclude that the casinos are perforce knowing participants in a scheme to defraud)."

Plaintiffs challenge the existence of good faith in defendant's transactions with Accettola by pointing to Accettola's poor quality of play and to steps taken by the casino to ensure that Accettola continued to gamble there, such as extending marker privileges to him, providing him with a host and with certain perks, and overlooking behavior that otherwise would have been grounds for removal from the casino's property. The record evidence, however, does not support that the steps the casino took to maintain a relationship with Accettola were anything other than the casino's standard business practices.

Mott stated in her affidavit that allowing Accettola to use a "marker" system to access front money he brought into the casino was "a standard convenience option offered to MGM patrons." Matthew Buckley, MGM's Vice President of Marketing and Player Marketing, testified at his deposition to the loyalty program available to all gamblers that awards points based on average bet and time played that are redeemable for various perks. He also stated that additional perks could be awarded by other casino personnel, including himself, the Assistant Vice President of Casino Marketing, a host manager, or a host. Buckley explained that the casino assigns a host to any player who loses more than $400 in a single day, the host is responsible for building a relationship with the player, and as already indicated, he or she may award additional perks outside of the point system. Even if defendant did take steps to cultivate and encourage a gambling relationship with Accettola, the undisputed testimony of Mott and Buckley establishes that it did so as part of its normal course of operations. Regarding plaintiffs' claim that Accettola was allowed to exhibit behavior for which other players would have been removed from the premises, their source for this claim is the deposition testimony of Tequilla Richardson, defendant's Chief of Security. However, the trial court could not properly consider Richardson's testimony because it is inadmissible hearsay to the extent that it pertained to incident reports that she did not write and which are not part of the record. MCR 2.116(G)(6); *Pitsch v ESE Michigan, Inc*, 233 Mich

Because the instant case involves similar facts and the same concepts, we find the bankruptcy judge's analysis persuasive.

App 578, 598; 593 NW2d 565 (1999) (explaining that affidavit representations about another person's observations do not establish a factual question because they are inadmissible hearsay).

Based on the foregoing, we conclude that plaintiffs have failed to show that defendant's casino was not acting in good faith when it acted in accordance with its normal course of business as a casino. See *Chomakos*, 170 BR at 595 (opining that the fact that casinos are "in the business of exploiting what some might consider human weaknesses with a possible result that potentially bodes ill for the creditors of some of its many patrons" does not mean that good faith does not exist in their transactions with patrons).

## 2. REASONABLY EQUIVALENT VALUE

Turning next to the question of whether defendant provided reasonably equivalent value for Accettola's wagers, defendant relies on the analysis and ruling of the Sixth Circuit Court of Appeals in *In re Chomakos*, 69 F3d 769 (CA 6, 1995), to argue that, as a casino licensed and regulated by the state, and operating in accordance with the state law and the rules set forth by the state gambling commission, it provides reasonably equivalent value for wagers as a matter of law. We do not believe that the Sixth Circuit's analysis supports defendant's legal proposition.

The Sixth Circuit affirmed the ruling of the bankruptcy court in the aforementioned case, *In re Chomakos*, 170 BR 585 (Bankr, ED Mich, 1993).[6] In the bankruptcy case, the bankruptcy judge explained that determining whether a debtor received reasonably equivalent value for his or her transfer was a two-step process. One first determined whether the debtor received "value," and then determined whether "that value was 'reasonably equivalent' to what [the debtor] transferred." *Chomakos*, 170 BR at 590. After surveying the various approaches federal courts have taken to determine whether transfers were for reasonably equivalent value, *id*. at 590-593, the bankruptcy court adopted a totality of the circumstances approach, *id*. at 593. Under this approach, the bankruptcy court considered whether the gambling transactions at issue were conducted at arms-length, the property or value transferred to the debtor, whether the debtor received additional valuable benefits because of the transactions, and whether the transactions involved good faith. *Id*. at 593-594. The bankruptcy court looked at the specific facts of the case, including the entertainment value of gambling and evidence submitted by the defendant casino, i.e., the Flamingo. The Flamingo had presented evidence showing the amount of money a gambler has a chance of winning at its blackjack tables and on its slot machines, including two of the three slot machines that one of the non-party debtors played. Based on its consideration of this evidence, as well as the entertainment value of gambling, the bankruptcy court found that the non-party debtor's received reasonably equivalent value for their bets. *Id*. at 595. However, the bankruptcy court expressly declined to "insulate as a matter of law all legal gambling transactions from the reach of creditors." *Id*. at 596.

The district court affirmed the bankruptcy court's ruling on appeal, and the Sixth Circuit affirmed the district court ruling. *Chomakos*, 69 F3d at 769. The federal circuit court observed that the critical point in time for determining whether a transferor received property of reasonably

---

[6] See note 3.

-8-

equivalent value in exchange for the money wagered is the point at which the bet was placed. *Id*. at 770.

> "The critical time is when the transfer is 'made.' Neither subsequent depreciation in nor appreciation in value of the consideration affects the . . . question whether reasonable [sic] equivalent value was given." [*Id*. at 771, quoting *In re Morris Communications NC, Inc.*, 914 F2d 458, 466 (CA 4, 1990), quoting *Collier on Bankruptcy*, § 548.09 at p 116 (15th ed, 1984).]

Further applying the foregoing proposition to gambling, the Appeals Court explained:

> Where gambling is lawful, as it was in the case at bar, the placing of a bet gives rise to legally enforceable contract rights. These contract rights constitute "property," of course, and at the time which Collier identifies as "critical"—a time before anyone can know whether the bet will be successful—the property has *economic value*. The property is not unlike futures contracts purchased on margin. The investor in futures may win big, or his position may be wiped out, but the contractual right to a payoff if the market happens to move the right way at the right time constitutes a value reasonably equivalent to the money at risk. [*Chomakos*, 69 F3d at 771 (emphasis added).]

Nevertheless, the Sixth Circuit explained that "[t]he existence of an economic value may be immaterial, however, if the dollar value of the gambler's chance of winning—augmented, perhaps, by an element of entertainment value—is not 'reasonably equivalent' to the amount of money wagered." *Id*. at 771. The Circuit Court then recounted the evidence the Flamingo presented in the bankruptcy court regarding the amount a gambler could win at certain games and how much Flamingo gamblers had won, the general payout ratios for the Flamingo's slot machines and the specific payouts for slot machines played by one of the non-party debtors, and the advantage the house enjoyed at the blackjack tables. *Id*. at 771. The Circuit Court concluded that this evidence "showed a reasonable equivalency." *Id*.

The Sixth Circuit's ruling in *Chomakos* reasonably stands for the proposition that, where lawful, gambling has economic value as a matter of law because the placing of a bet gives rise to enforceable contractual rights. However, whether that value is "reasonably equivalent" to the gambler's wager is a fact question that depends in significant part on the chance of winning. Applying the federal circuit court's reasoning to the instant case, since casino gambling is legal in Michigan, Accettola received economic value with each wager placed because such betting gave rise to enforceable contract rights. However, whether that value was "reasonably equivalent" to his wager was a fact question. Furthermore, defendant had the burden of establishing by a preponderance of the evidence that Accettola received reasonably equivalent value for his wagers, and thus the applicability of MCL 566.38(1). MCL 566.38(7)(a) and (8). As plaintiffs correctly point out, defendant did not produce any evidence relative to the showing of a reasonable equivalency in value. Nevertheless, considering all the record evidence produced in the light most favorable to plaintiffs, MCR 2.116(G)(5), we conclude that the trial court did not err in ruling that defendant provided reasonably equivalent value for Accettola's wagers.

The appendix plaintiffs attached to their brief in opposition to defendant's renewed motion for summary disposition included two daily logs, one from October 2014 and one from June 2015. These logs broke down Accettola's betting pattern at blackjack. The October 2014 report was based on analysis of 175 hands of blackjack, and the June 2015 report was based on analysis of 219 hands of blackjack. Each log reported that the house advantage at blackjack, the game Accettola played, was 0.34%. However, because Accettola's gambling strategy was worse than basic, the house advantage against him was reported as 0.51% (October 2014) and 0.53% (June 2015). Plaintiffs do not dispute that the casino's advantage on the game Accettola played was 0.34% nor argue that a house advantage of 0.34% does not constitute reasonably equivalent value for wagers. Accordingly, the trial court could properly conclude that the record evidence preponderated toward a finding that defendant provided reasonably equivalent value for Accettola's wagers. See *Chomakos*, 69 F3d at 772 (suggesting that a house advantage of one percent or less against a player with "a fair knowledge of the game and [who] uses good basic strategy" is consistent with reasonably equivalent value).

Plaintiffs argue that, because the casino knew that Accettola's play at blackjack did not exhibit a fair knowledge of the game and good basic strategy, the higher than usual advantage the casino held against Accettola meant that the casino did not provide reasonably equivalent value for Accettola's wagers. We disagree.

Generally, whether a casino provides reasonably equivalent value for wagers is an objective analysis based on the skill of what one might term a "reasonable gambler," i.e., a gambler with fair knowledge of the game and good basic strategy. See *id*. Reasonably equivalent value is not based on the skill of each gambling debtor. Requiring the casino to provide reasonably equivalent value that accounts for each individual gambler's skill level would place an untenable burden on casinos to identify poorly skilled players and either exclude from their premises those who lacked basic skills or restrict them only to those games at which they exhibited fair knowledge and good basic strategy. Casinos that did not do this would run the risk of being susceptible to voidance of a player's bets should the player declare bankruptcy or should a creditor seek voidance of the bets as fraudulent conveyances because they did not provide player-specific reasonably equivalent value.

The preponderance of the evidence in the present case indicates that the casino has a 0.34% advantage against a blackjack player with fair knowledge of the game and good basic betting strategy. Based on the Sixth Circuit's persuasive reasoning in *Chomakos*, the casino provides reasonably equivalent value to bettors in exchange for their wagers. See *id*. Further, *Chomakos* suggests that a house advantage of one percent or less against a gambler with fair knowledge of the game and good basic strategy is consistent with the provision of reasonably equivalent value. The casino in this case had at most a 0.54% advantage against Accettola, who exhibited worse than basic strategy. This is well within the range suggested as acceptable in *Chomakos*. *Id*.

Based on the foregoing analysis, we conclude that the trial court did not err in granting summary disposition of plaintiffs' claim under MCL 566.34(1)(a) in favor of defendant pursuant to MCR 2.116(C)(10) because a preponderance of the undisputed evidence established that defendant's casino received transfers of money from Accettola in good faith and for reasonably equivalent value. MCL 566.38(1).

## 2. CONSTRUCTIVE FRAUD

We likewise conclude that the trial court did not err in granting defendant summary disposition of plaintiffs' constructive fraud claim, MCL 566.35(1). To void a transfer under MCL 566.35(1), plaintiffs had to establish that their claim arose before the transfers, that Accettola was insolvent or became insolvent because of the transfers, *and* that Accettola did not receive " 'reasonably equivalent value in exchange for the transfer . . . .' " *Dillard*, 308 Mich App at 446 emphasis added). As discussed above, the preponderance of the undisputed evidence shows that Accettola received reasonably equivalent value for his wagers. In addition to economic value of reasonable equivalence, see *In re Chomakos*, 69 F3d at 771-772, record evidence shows that Accettola received additional benefits, including complimentary hotel stays, food and beverages, shows, travel, and over $131,520 in other complimentary items. Because plaintiffs cannot establish that Accettola did not receive reasonably equivalent value for his wagers, they cannot establish a claim for constructive fraud under MCL 566.35(1).[7] Therefore, the trial court did not err in granting defendant's motion for summary disposition of this claim pursuant to MCR 2.116(C)(10).

Affirmed.

/s/ Jane M. Beckering
/s/ Mark J. Cavanagh
/s/ Cynthia Diane Stephens

---

[7] For the same reason, we reject plaintiffs' argument that the trial court erred by not granting its motion for summary disposition of defendant's affirmative defense regarding reasonably equivalent value.