In re C.H. BUTCHER, Jr., Debtor.

James R. MARTIN, Trustee, Plaintiff,

v.

Karl A. SCHLEDWITZ, Defendant.

James R. MARTIN, Trustee, Plaintiff,

v.

SCHLEDWITZ, CROW, BELILES, BEARMAN, BUTLER & WASHINGTON, a Professional Corporation, Defendant.

Bankruptcy No. 3–83–01008.
Adv. Nos. 3–85–1143, 3–85–1144.

United States Bankruptcy Court,
E.D. Tennessee.

Dec. 12, 1986.

See also, 67 B.R. 102.

Weinberger, Weinstock, Sagner, Stevan & Harris, P.A., Neal S. Melnick, Cyd B. Wolf, Baltimore, Md., James R. Moore, Knoxville, Tenn., for plaintiff.

Thomason, Hendrix, Harvey, Johnson, Mitchell, Blancard & Adams, Albert C. Harvey, Cheryl L. Rumage, Memphis, Tenn., for defendants.

CLIVE W. BARE, Bankruptcy Judge.

In these adversary proceedings the trustee seeks to avoid five transfers to the defendants totaling $51,000.00. 11 U.S.C.A. §§ 544(b), 548, and 549 (West 1979). This court has jurisdiction pursuant to 28 U.S.C.A. §§ 1334(b) and 157(a) (West Supp. 1986). This is a core proceeding. 28 U.S.C.A. § 157(b)(1) (West Supp.1986).

I

Defendants Karl A. Schledwitz ("Schledwitz") and the law firm of Schledwitz, Crow, Beliles, Bearman, Butler and Washington (the "Firm"), a Professional Corporation, negotiated the following checks received from the debtor, C.H. Butcher, Jr. ("Butcher"):

a. Check # 101 drawn on Butcher's account at City and County Bank of Union County ("UCB") dated March 25, 1983, in the amount of One Thousand Dollars ($1,000.00) payable to Schledwitz;

b. Check # 1738 drawn on Butcher's account at UCB dated July 12, 1983, in the amount of Ten Thousand Dollars ($10,-000.00) payable to Schledwitz;

c. Check # 131 drawn on Butcher's account at Knox Federal Savings & Loan dated April 11, 1983, in the amount of Fifteen Thousand Dollars ($15,000.00) payable to Schledwitz; and

d. Check # 1747 drawn on Butcher's account at UCB dated May 23, 1983, in the amount of Twenty-Five Thousand Dollars ($25,000.00) payable to the Firm.

The checks dated March 25, 1983, April 11, 1983, and May 23, 1983, were received within one year of the date of the filing of the involuntary petition in bankruptcy.[1] The check dated July 12, 1983, was received within the "involuntary gap period," after the date of the filing of the petition and prior to the entry of the order for relief.

The trustee contends that no value for these transfers was received by the debtor's estate and, therefore, the transfers can be recovered by him. Defendants respond that the payments represent contemporaneous payments for legal services, for advances to consultants, and for advanced expenses.

The trustee established by his own testimony and that of and Tim T. Morris, a partner in the accounting firm of Deloitte, Haskins and Sells, that the debtor Butcher was insolvent on December 31, 1982, with a deficit net worth of $34,318,484.00, and that there was no significant improvement in his financial condition from that date until the dates of each of the transfers

---

1. The involuntary petition was filed June 24, 1983; the order for relief (chapter 7) was entered July 15, 1983.

which are the subject of this litigation, and the court so finds.

Mr. Jeff Crow, a partner in the Schledwitz law firm, testified that when fees were received from clients they were placed in the Firm's general account. If it was for something other than fees, the funds went into a trust account. The Firm did not keep elaborate accounting procedures, fee slips, or records of that nature. They did not have a bookkeeper or office manager. The attorneys charged travel expenses on their individual credit cards; when the client paid the Firm the payment was applied to the expenses.

Between March and July 1983, Schledwitz was out of the office virtually all of the time, traveling to Knoxville, Washington, D.C., and Kentucky. He called his office on a regular basis, two or three times a day.

Mr. Crowe testified that the $25,000.00 check was deposited in the Firm's trust account. The funds were then disbursed by two checks—$15,000.00 to Mr. Schledwitz for reimbursement of expenses, and $10,000.00 deposited in the Firm's general account. The expenses included two $5,000.00 payments by Schledwitz to Vining Sparks for his services and $5,000.00 for Schledwitz's travel expenses. The Firm did not require any detailed accounting of the expenses—"We accepted his [Schledwitz] word."

Defendant's Exhibits A and B are two $5,000.00 checks dated April 1, 1983, and April 5, 1983, payable to Vining Sparks and drawn on Schledwitz's personal account. The checks reflect they were in payment of "Retainer to Ben Rollins from Karl Schledwitz, Trustee for Client."

Mr. Schledwitz testified that he first met Mr. Butcher in 1970 while a student at the University of Tennessee. He developed a very close relationship with him at that time and worked under his direction in his brother's (Jake Butcher's) campaigns for governor in 1974 and 1978. After graduating from law school in 1977, Schledwitz established a law practice in Memphis with three other attorneys. Prior to January 1983, he did some estate planning for Butcher and his wife and family. In the course of his law practice he did not regularly keep time slips. He billed Butcher for the work done and, in turn, received a check from Butcher.

In January and February 1983, Butcher was having financial and legal problems. Schledwitz came to Knoxville in February to discuss some of the problems that Butcher was having. In late February or early March 1983, Butcher called Schledwitz and asked him to come to Knoxville and help him with his problems, telling him that his long-time personal counsel was not available, and that he needed somebody he could trust.

Mr. Schledwitz came to Knoxville believing it would be for a very short period of time. Reciting what he found, however,—

When I came here, Your Honor, it was nonstop. There were threats—early on it was threats of lawsuits. Later on it was lawsuits by the day. But at all times it was a fast pace, and we were on the road virtually every other day going somewhere, trying to put together deals to sell the banks, merge the banks, reorganize the banks to try to avoid Mr. Butcher from litigation and to try and settle pending and threatened litigation.

Transcript at 97.

According to Schledwitz, he and Butcher visited Washington on at least ten occasions, meeting with Federal Deposit Insurance Corporation personnel. He also had several meetings with Ben Rollins, a financial consultant in Memphis, seeking his help in obtaining a sale of the Butcher banks and Southern Industrial Banking Corporation [2] to the Union Planters Bank. At one time it appeared an agreement had been reached, but ultimately the plan fell through.

---

**2.** Southern Industrial Banking Corporation, an industrial loan and thrift company with close ties to Butcher, filed a chapter 11 bankruptcy petition in March 1983.

Mr. Schledwitz says he contacted a large number of law firms on Mr. Butcher's behalf—

Mr. Butcher, obviously had a large number of legal problems and legal needs at that time, and I assisted him in trying to hire law firms and coordinate legal activities on his behalf.

Transcript at 99.

Among those contacted were the Kramer firm in Knoxville and the Macey firm in Atlanta. According to Schledwitz, they also hired and worked with securities and regulatory firms in Washington and, when Mr. Butcher was sued in Memphis, the Armstrong, Allen, Goodman firm in that city.

Mr. Schledwitz says he advanced expenses during this time. He cites two checks totaling $10,000.00 drawn on his personal account payable to Vining Sparks for Ben Rollins' work in regard to a proposed sale of the banks to the Union Planters Bank. Butcher said "[W]rite him a check, and I will pay you back."

Mr. Schledwitz asserts he received the $1,000.00, $10,000.00, and $15,000.00 checks "for services I had rendered as a lawyer for C.H. Butcher, Jr." In Schledwitz's opinion "the work had been performed."

With respect to the $25,000.00 that went to the law firm, Schledwitz testified:

[I]t was brought to my law firm's attention by me that I had incurred a number of expenses. Most of my travels were with Mr. Butcher in a private plane, but on a variety of occasions I flew privately—I mean, commercially, excuse me, and I'd advance[d] the money to Vining Sparks [Ben Rollins]. And I had estimated that I had at least $15,000 in expenses at that time and discussed with my partners taking $10,000 of that $25,000 and applying it to the law firm, and then at that point I would have received a total of $30,000 from Mr. Butcher of which I explained $15,000 would be allocated toward the expenses I had advanced and $15,000 toward the services that I had

rendered that I would be given sole credit for that I discussed with my partners.

.    .    .    .    .    .

I discussed with them the $10,000 I'd advanced specifically to Mr. Rollins, and I estimated my expenses at that time.

Transcript at 102.

Mr. Schledwitz explains his lack of records and time slips as follows:

I'd like to point out to the Court, Your Honor, that although in hindsight I certainly recognized I should have had time slips, I was operating out of Knoxville. I did not have an office in Knoxville nor did I have a secretary. I came up here to do work, and I stayed up here doing work and was flying around somewhere different every day, and I was not keeping prudent records, and I acknowledge that. But I estimated to my partners what my expenses to date were and had estimated them to Mr. Butcher, and there had been no disagreement.

Transcript at 102–103.

Mr. Schledwitz estimates that Mr. Butcher was with him 80% of the time. Mr. Butcher's secretary would refer all of Butcher's calls of a legal nature to Schledwitz to respond to "on virtually a daily basis."

Mr. Schledwitz was unable to state exactly how many hours he spent working on behalf of Butcher during this four or five month period but "modestly" believes he was "working 18 hours a day, every day, six or seven days a week.... 80 percent plus of my time was directly for Mr. C.H. Butcher." (Transcript at 105.) He believes this time would calculate well into six, seven, or eight hundred hours.

Joel B. Piassick, an attorney in Atlanta, testified that he represented Southern Industrial Banking Corporation ("SIBC") in the chapter 11 proceeding filed in Knoxville in March 1983. He first met Mr. Schledwitz in Knoxville on March 9 and spent the better part of the day with Schledwitz and Butcher. After that he met with Schledwitz on several occasions and talked with him on the phone several times. Mr. Pias-

sick's time records filed with his fee application in the SIBC case reflect these meetings and calls.

In early 1983, Douglas R. Beaty represented David A. Crabtree, and C.H. Butcher, Jr., and their related interests. He received a monthly salary of $2,000.00 from each. Between February and July 1983, Butcher was trying to work out of his financial situation. Beaty testified he was aware that Schledwitz was performing legal services for Butcher in Knoxville "on a daily basis." Schledwitz seemed to be in Knoxville when Butcher was, performing services as a consultant or a counselor. At that time the pace of activity was not leisurely but the opposite. According to Beaty, "Most—probably all of the people that were in any way involved with Mr. Butcher at that time were working many days a week, many hours a day. Certainly more than five days a week and eight hours." (Transcript at 87).

Between March and July 1983, Mike Winchester, an attorney in Knoxville was trying to help C.H. Butcher, Jr.'s brother, Jake Butcher, sell or salvage some of his banks that remained after the failure of the United American Bank of Knoxville. Mr. Winchester testified that during that time Mr. Schledwitz was doing the same type of work for C.H. Butcher, Jr. Winchester would usually see Schledwitz in the early morning or late night, working very hard, and doing similar things to what Winchester was doing. He saw him many times late at night in law offices in Knoxville. He recalls, perhaps, a dozen occasions that he saw Schledwitz in Knoxville. He knew Butcher and Schledwitz were traveling to other places, including cities in Kentucky and to Washington, D.C.

Defendants' response to plaintiff's first request for production of documents, dated February 7, 1986, reflects the following:

REQUEST NO. 1: All documents which reflect, refer to or relate to the subject matter of this litigation, the purposes for which payments described in the Complaint were made and the underlying debts, if any.

RESPONSE: This defendant does not have in its possession any of the documents as requested in Plaintiff's Request for Production of Documents.

In a supplemental response to plaintiff's first request for production of documents, dated March 27, 1986, the following response was submitted:

Receipts that have been located since the filing of the Response are attached hereto.

Attached to the Response is a typewritten statement of air fares, meals, taxis, tolls, parking, and hotels, from February 9, 1983, through May 27, 1983, totaling $4,959.83. Also attached are copies of various credit card charges, hotel bills and restaurant receipts. Mr. Schledwitz's explanation for his original response of "no records" was that he was going through an audit and had turned over all of his records to his accountant. After the records were returned to him he recognized that he had the ability to recreate actual travel expenses.

## II

The trustee asserts the transfers which occurred on March 25, 1983, ($1,000.00), April 11, 1983, ($15,000.00), and May 23, 1983, ($25,000.00), are voidable pursuant to 11 U.S.C. §§ 544 and 548 and that the transfer which occurred on July 12, 1983, ($10,000.00) is a post-petition transfer voidable pursuant to 11 U.S.C. § 549.[3]

Section 544(b) in pertinent part, provides that the trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under § 502. The trustee cites §§ 4 through 7 of the Uniform Fraudulent Conveyance Act, Tenn.Code Ann. §§ 66–3–305 through 308 (1982).

---

**3.** See plaintiff's proposed findings of fact and conclusions of law filed August 4, 1986. Plaintiff does not assert the transfers are voidable pursuant to 11 U.S.C. § 547, as he did in his original complaint.

Section 548(a), in pertinent part, provides that the trustee may avoid any transfer of an interest of the debtor in property that was made or incurred within one year before the date of the filing of the petition if the debtor made such transfer or incurred such obligation (1) with actual intent to hinder, delay, or defraud creditors, or (2) received less than a reasonably equivalent value in exchange for such transfer, and was insolvent on the date the transfer was made.

■ Thus, as to the pre-petition transfers, the critical question presented under § 548(a)(2) is whether the debtor received reasonably equivalent value for the transfers.[4] The court finds that he did. It is undisputed in this record that from February or March through May 27, 1983, Schledwitz performed various legal and other services for the debtor, six to eight hundred hours in all. These services have been detailed heretofore and will not be repeated. Schledwitz was owed a debt for legal services and for expenses advanced. When Schledwitz received payment on the dates in question, the debtor received "reasonably equivalent value," i.e. satisfaction of an antecedent debt. That is all that § 548(a)(2) requires.

### III

■ The $10,000.00 transfer on July 12, 1983, was effected during the "involuntary gap period"—after the date of the filing of the petition on June 24, 1983, and prior to the entry of the Order for Relief on July 15, 1983. The trustee seeks to avoid this transfer pursuant to § 549 (Postpetition transactions).

Section 549(a) provides that the trustee may avoid a transfer of property of the estate that occurs after the commencement of the case. The statute is concise and explicit. The only exceptions to this rule are embodied in (b) and (c) of § 549.

Subsections (b) and (c) of section 549 create two very narrow exceptions to the trustee's power of avoidance. First, section 549(b) provides that transfers during the "involuntary gap" period between the filing of the petition and the order for relief in an involuntary case are not voidable to the extent that postpetition value is given.... Section 549(c) provides that the trustee may not avoid transfers of realty to good faith purchasers for present fair equivalent value without knowledge of the commencement of the case, if a copy or notice of the petition has not been filed in an appropriate recording office where the property is located.

4 *Collier on Bankruptcy* ¶ 549.02 (15th ed. 1986).

Bankruptcy Rule 6001 states that an entity asserting the validity of a transfer under § 549 of the Code has the burden of proof.

Expense records submitted by Schledwitz, Exhibit "E," commence on February 9, 1983, and end on May 27, 1983. There is no evidence nor documents establishing any services performed by him after June 24, 1983, the date the petition was filed. Thus Schledwitz has failed to establish that any value was given or any services were performed by him within the "gap" period. The burden is upon him. This transfer may be avoided. Judgment will be entered in favor of the trustee in the sum of $10,-000.00. 11 U.S.C.A. § 550(a)(1) (West 1979).

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.

---

**4.** For the purposes of § 548, "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor,...." 11 U.S. C.A. § 548(d)(2)(A) (West 1979).