187 B.R. 455 (1995)
In re R.M.L., INC., previously known as Intershoe, Inc., Debtor.
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on Behalf of R.M.L., INC., previously known as Intershoe, Inc., Plaintiff,
v.
MELLON BANK, N.A., Defendant.
Bankruptcy No. 1-93-00137A.
United States Bankruptcy Court, M.D. Pennsylvania.
June 29, 1995.
*456 *457 *458 Robert D. Segal, Philadelphia, PA, Virginia P. Henschel, Rhoads & Sinon, Harrisburg, PA, for plaintiff.
Harvey Forman, Philadelphia, PA, for defendant.

MEMORANDUM
ROBERT J. WOODSIDE, Chief Judge.
Before me is a Complaint filed by plaintiff The Official Committee of Unsecured Creditors, on behalf of Intershoe, Inc. (the "Committee") seeking to recover $515,000.00 in payments made by debtor Intershoe, Inc. ("Intershoe") to defendant Mellon Bank, N.A. ("Mellon") pursuant to Section 548(a)(2) of the Bankruptcy Code, together with prejudgment interest. For the reasons stated below, judgment will be rendered in favor of the Committee and against Mellon in the amount of $387,461.96.

Procedural history
On February 18, 1992, Intershoe filed its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. On January 20, 1993, I issued an Order confirming the Chapter 11 plan of reorganization submitted by Intershoe. Pursuant to the terms of the confirmed plan, all claims of Intershoe for the avoidance of preferential and fraudulent transfers pursuant to Sections 547, 548 and 550 of the Bankruptcy Code were assigned to the Committee to pursue for the benefit of unsecured creditors.
On May 20, 1993, the Committee initiated the instant adversary proceeding against Mellon. Mellon filed an answer, and extensive discovery ensued. I conducted a trial on October 18 and 19, 1994, and December 21 and 22, 1994. The parties subsequently filed proposed findings of fact and conclusions of law and legal briefs.
On May 2, 1994, the Committee filed a motion seeking to reopen the record to take the trial deposition of Braxton Glasgow. Mellon opposed the requested relief and I conducted a telephone conference on May 5, 1995, and entered an Order denying the requested relief. My decision was based upon the timing of the request and the absence of evidence that the testimony was not previously available.

Factual findings
1. At all times relevant to the Complaint, Intershoe engaged in the business of large-scale wholesale distribution of women's shoes. Intershoe imported the bulk of its product lines from sole-source suppliers in Italy, Spain and Yugoslavia.
2. Through 1991, Intershoe's primary secured lender was a group of banks which included Signet Bank of Virginia, Signet Bank of Maryland, Corestates Bank, N.A., and the Bank of Tokyo Trust Company (collectively the "Signet Group"). Intershoe also *459 had subordinated indebtedness to Westinghouse Credit Corporation ("Westinghouse") and Westinghouse held stock purchase warrants with respect to Intershoe stock.
3. In the Spring of 1991, contemplating that the expiration of existing financing with the Signet Group would occur in the Fall, Intershoe sought to recapitalize and refinance its operations. Intershoe sought to attract an equity investment in the amount of $15 million. At the same time, Intershoe sought to replace the Signet Group as its secured lender with a new bank group extending a $53 million loan facility.
4. In March, 1991, Three Cities Research ("TCR") made an initial non-binding proposal to make a $15 million investment in Intershoe and began a process of due diligence and negotiation with Intershoe.
5. Intershoe approached Mellon, The Bank of New York Commercial Corporation ("BONY") and Citicorp North America, Inc. ("Citicorp"), seeking potential refinancing. In discussions with each lender, it was clear that an equity infusion would be a prerequisite to refinancing.
6. Representatives of Mellon had their initial meeting with representatives of Intershoe in February or March, 1991.
7. In April, 1991, Intershoe entered into an agreement with Westinghouse which provided Intershoe with the ability to retire its outstanding subordinated indebtedness to Westinghouse and repurchase the stock purchase warrants of Intershoe held by Westinghouse.
8. On June 13, 1991, Mellon issued a proposal letter documenting its interest in extending a $53 million revolving demand line of credit and a $100 million foreign exchange line of credit. The proposal was contingent upon the proposed $15 million cash injection by TCR.
9. Intershoe did not accept Mellon's June 13, 1991, proposal, but rather continued to explore potential financing with BONY and Citicorp, which initially did not contemplate the necessity of a large-scale equity injection.
10. Citicorp performed its due diligence and ultimately determined that it would not extend credit to Intershoe. BONY made a proposal, but revised it to require a large-scale equity infusion, and Intershoe chose not to endorse that proposal. Subsequently, Intershoe returned to Mellon to pursue the refinancing.
11. On August 9, 1991, Mellon issued a second proposal letter similar in terms to its June 13, 1991, letter, also indicating that the proposed financing was contingent on the injection of new capital funds of at least $15 million. Other relevant provisions of the proposal letter were that: 1) Intershoe would pay a "facility fee" of ¾ percent of the committed facility, half upon issuance of a commitment letter and half at closing; 2) Intershoe would pay a collateral management fee of $10,000.00, after the advancement of the lines; 3) Intershoe would reimburse Mellon for:
[a]ll out-of-pocket expenses, including without limitation, attorney's fees, field examination costs, searches and filing fees, . . . regardless of whether a financing package is concluded[;]
4) Intershoe would remit a "good faith deposit" in the amount of $125,000.00 with written approval of the letter; and 5) Mellon was required to have commitments from other financial institutions for $28 million of the $53 million facility. The proposal letter also set out the initial set of conditions under which Intershoe's "good faith deposit" would be retained by Mellon.
12. The transaction contemplated in Mellon's August 9, 1991, proposal letter was an asset-based loan and also a "highly leveraged transaction" ("HLT"), which involve greater risk than the more common type of loan collateralized by real estate. The type of loan contemplated required extraordinary measures of due diligence and monitoring of the borrower's financial condition.[1]
*460 13. Intershoe accepted and executed the August 9, 1991, proposal letter.
14. On August 12, 1991, Mellon received the initial sum of $125,000.00 from Intershoe by wire transfer pursuant to the August 9th proposal letter.
15. By August, 1991, Intershoe was against its borrowing base with the Signet Group and therefore could not borrow additional sums. Between August and October, 1991, Intershoe did not pay the vast majority of its invoices from suppliers and its unpaid accounts payable owed to trade creditors increased by approximately $10 million while its debt to the Bank Group decreased by approximately $10 million.
16. Between August 9, 1991, and November 18, 1991, Intershoe had numerous materially adverse changes which resulted in $4.1 million in losses for September and October, 1991.[2]
17. The Signet Group agreed to extend its loan facility from September 30, 1991, through November 29, 1991, which in turn permitted Intershoe to continue its business operations.
18. In early October, 1991, Mellon retained a law firm in connection with the proposed closing of the proposed Intershoe/Mellon transaction scheduled for November 26, 1991.
19. In October, 1991, Mellon requested an additional good faith deposit from Intershoe of $125,000.00. No letter, invoice or similar document was entered into evidence to document this request.
20. On October 8 or 9, 1991, Mellon received the additional fee of $125,000.00 from Intershoe by wire transfer.
21. By letter dated October 31, 1991, Westinghouse agreed to restructure Intershoe's indebtedness and its equity position and to subordinate $5 million of its debt in order to accommodate the recapitalization and refinancing of Intershoe.
22. On November 7, 1991, Mellon issued its formal commitment letter to Intershoe, agreeing to provide Intershoe a revolving line of credit and a foreign exchange facility essentially consistent with the August 9, 1991 proposal letter. The commitment letter:
a) made reference to the sum of $250,000.00 in good faith deposits that Mellon previously had received and stated that the entire amount would be retained by Mellon if a closing did not occur as reimbursement for expenses and as additional compensation for Mellon's time and effort in attempting to consummate the financial package;
b) requested Intershoe, if it accepted the commitment, to remit the additional sum of $265,000.00 to Mellon, one-half of which (or $132,500.00) represented a "non-refundable" facility fee representing compensation for Mellon's commitment, and the other one-half represented a "non-refundable" agent's fee for Mellon's syndication of the loan transaction;[3]
c) required a draft audited financial statement showing Intershoe had a net worth of approximately $6.5 million;
d) contained the condition that the Westinghouse debt and stock warrants be repaid or retired and that Westinghouse remain a creditor for subordinated debt of at least $5 million;
e) contained the condition that $28 million of the $53 million loan to Intershoe be participated out to other lenders who were satisfactory to Mellon;
f) contained the condition that there be excess availability under the line of credit of $4 million and Intershoe have a positive net worth of $6.5 million; and
g) provided for a separate collateral monitoring fee relating to administering the loan after closing.
*461 23. The commitment letter by its terms was due to expire on November 29, 1991, when the Signet Group facility was due to expire.
24. By the time it issued its commitment letter, Mellon had commitments from other banks to participate in the loan facility in excess of the amount necessary to fulfill the syndication condition.
25. On November 7, 1991, Intershoe accepted Mellon's commitment and tendered a check in the amount of $265,000.00 pursuant to the terms of the commitment.
26. Mellon commenced a takedown examination on or about November 7, 1991, to update financial information through the date of closing.
27. On November 15, 1991, Mellon received a draft financial statement from Intershoe confirming and verifying the financial statement previously provided by Intershoe and reporting that Intershoe had a net worth of approximately $6.5 million. On the same day, Mellon scheduled a meeting for November 20, 1991, with Intershoe, the loan participants, TCR and Peat Marwick to further discuss the financial statements.
28. On November 17, 1991, TCR advised Intershoe by telephone that it had decided not to go forward with the equity infusion and confirmed its withdrawal by letter dated November 18, 1991. Intershoe advised Mellon of TCR's withdrawal by telephone on November 18, 1991.
29. After Mellon learned of TCR's withdrawal, the proposed Mellon/Intershoe transaction collapsed and a closing on the Mellon financing never occurred. Mellon's total out-of-pocket costs related to the proposed Intershoe transaction were $127,539.00.
30. Intershoe's trade creditors continued to extend credit to Intershoe even after the Mellon/Intershoe transaction collapsed and the Mellon commitment expired by its terms.
31. KPMG Peat Marwick ("Peat Marwick") was the public accounting firm engaged by Intershoe to complete annual financial audits, to prepare audited financial statements and to assist Intershoe with tax compliance.
32. In accordance with Generally Accepted Audit Standards ("GAAS"), Peat Marwick conducted a financial audit of Intershoe for the fiscal year ended August 31, 1991, and finalized an audited financial statement prepared in accordance with Generally Accepted Accounting Principles ("GAAP") on approximately November 15, 1991, in which it reported that, as of August 31, 1991, Intershoe's liabilities exceeded its assets by $4,055,000.00.
33. According to GAAS and GAAP, when events after the balance sheet date provide additional evidence of "conditions that existed at the date of the balance sheet," adjustments should be made to an audited financial statement prepared under GAAP so that the statement truly reflects those conditions. Intershoe's audited financial statement was prepared in accordance with this principle and, notwithstanding the fact that certain adjustments were physically recorded after the balance sheet date, the underlying events and circumstances properly were considered in assessing the value of the company on the balance sheet date. For example, the termination of Intershoe's financial negotiations with TCR and Mellon, which occurred after August 31, 1991, was properly considered as evidence of Intershoe's financial condition as of August 31, 1991, and warranted adjustments to Intershoe's audited financial statement.
34. An adjustment Peat Marwick noted should be made under the "subsequent events" principle was the write-off of $754,000.00 in pre-paid financing fees which previously were reflected by Intershoe as an asset. Under the circumstances of this case, including the deteriorating financial condition of Intershoe, the numerous unfulfilled conditions contained in Mellon's loan proposal (and especially the failure to obtain the $15 million equity infusion), it would have been inappropriate to permit the $754,000.00 to remain on Intershoe's financial statements as an asset as of August 31, 1991.
35. Another change Peat Marwick noted should be made under the "subsequent events" principle was to adjust the financial statement to write off $3.668 million owed to Intershoe from IS International, an affiliate *462 owned by Intershoe's president, and to record such advances as a loss on Intershoe's August 31, 1991, audited financial statement. IS International was in extremely poor financial condition as of August 31, 1991, and there was no reasonable possibility that its account would ever be paid.[4]
36. Another change Peat Marwick noted should be made to Intershoe's financial statement was the exclusion as unsubstantiated of a $4.5 million credit allegedly due from factory suppliers relating to defective merchandise, which for some period of time Intershoe carried on its books.
37. On or about December 11, 1991, Intershoe properly accepted the changes to its August 31, 1991, financial statement Peat Marwick noted should be made and recorded those changes.[5]
38. Peat Marwick's 1991 audited financial statement also included a "going concern paragraph," which indicated that Intershoe would have difficulty remaining in existence for an additional 12 to 15 months as a going concern, and indicated that the auditors had not adjusted assets or liabilities for that likelihood. Peat Marwick included the going concern paragraph "due to the substantial current period loss; a working capital deficiency of approximately $15,231,000; a stockholder's equity deficiency of approximately $4,055,000; and the default of certain loan covenants."
39. Although GAAP permitted $6.7 million in receivables due from Intershoe Canada, Inc. ("Intershoe Canada") and MidLantic Footwear, Inc. ("MidLantic"), two affiliates owned by Intershoe's president, to remain on the audited financial statement as an asset, realization on those assets was doubtful and a cautionary notation was made on the statement.
40. Intershoe's monthly internal operating statements also demonstrate the degree to which its financial condition had deteriorated and continued to deteriorate. The October statement indicated a loss for the two months ending October 31, 1991, of $4,132,934.00; the November statement indicated a $390,514.00 loss for the month;[6] the December statement indicated a $690,326.00 loss for the month; and the January statement indicated a loss of $1,245,069.00 for the month.
41. Intershoe's amended schedules and statements indicate an excess of liabilities over assets in the amount of approximately $14 million.
42. The value of assets stated on Intershoe's schedules was far more than the amount actually realized through sale of said assets in the bankruptcy proceedings.[7]
43. The Committee's fair value analysis suggested that Intershoe had a value less than reported on the 1991 financial statements. In this analysis, in addition to write-offs required by Peat Marwick, the Committee subtracted from the value of the company the amount of receivables due from Intershoe Canada and MidLantic due to their uncollectibility and eliminated the value related to a detachable warrant to Westinghouse carried on Intershoe's books as an asset.

Discussion
The Committee seeks to recover 3 separate payments totaling $515,000.00 made by Intershoe to Mellon on August 12, 1991, October 8, 1991, and November 7, 1991, respectively, several months before Intershoe *463 filed its Chapter 11 petition. The Committee brought its sole count against Mellon pursuant to the constructive fraud portion of the Bankruptcy Code's fraudulent transaction section, which provides in relevant part:
the trustee may avoid any transfer of an interest of the debtor in property, that was made or incurred on or within one year before the date of filing of the petition, if the debtor voluntarily or involuntarily 
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
11 U.S.C. § 548(a). Section 548(a)(2) permits avoidance if the trustee can establish:
(1) that the debtor had an interest in property;
(2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition;
(3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and
(4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer."
BFP v. Resolution Trust Corp., ___ U.S. ___, ___, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556, rh'g denied, ___ U.S. ___, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994). The first and second elements are not in dispute. Mellon disputes the Committee's allegations that Intershoe was insolvent at the time the relevant transfers occurred and that Intershoe did not receive "reasonably equivalent value" in exchange for the transfers. The parties agree that, under Section 548 of the Bankruptcy Code, the ultimate burden of proof rests upon the Committee. See Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 648 (3d Cir.1991), cert. denied sub nom. Committee of Unsecured Creditors v. Mellon Bank, N.A., 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); In re Pittsburgh Cut Flower Co., 124 B.R. 451, 456 (Bankr.W.D.Pa.1991).
A. Insolvency
The Bankruptcy Code defines insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). This test is frequently referred to as the balance sheet test. The relevant date for determining the value of a company's assets is the time of the alleged transfer. In re Morris Communications, Inc., 914 F.2d 458, 466 (4th Cir.1990); In re Coated Sales, Inc., 144 B.R. 663, 668 (Bankr.S.D.N.Y.1992).
In the case before me, Intershoe's insolvency subsequent to August 31, 1991, was established by the Committee through the testimony of three certified public accountants relying upon Intershoe's audited financial statements which indicated that, as of August 31, 1991, Intershoe's liabilities exceeded its assets by some $4 million. Mellon's principal rejoinder to this evidence is its contentions that: 1) as long as there was a potential for the closing of the Mellon/Intershoe loan transaction, certain write-offs made in the audited financial statement should not have occurred; 2) it was only after the proposed Intershoe/Mellon transaction collapsed in mid-November that those write-offs were warranted and in fact were physically made; and 3) in absence of those write-offs Intershoe was solvent.
Although Mellon's logic has a certain chronological appeal, as reflected in my factual findings, I accepted the Committee's evidence which indicated that, pursuant to GAAS and GAAP, the subsequent events surrounding the collapse of the proposed Intershoe/Mellon should be treated as evidence of Intershoe's financial condition as of August 31, 1991. Although events which drastically and unexpectedly change a company's actual financial condition (such as a fire or other disaster) would not be the type of subsequent event that should evidence a company's prior financial condition, I agreed with the testimony of the Committee's experts that the failure of the proposed Mellon/Intershoe transaction is exactly the type of event that should be viewed as evidence of the company's prior financial condition.
*464 By all accounts, Intershoe's financial survival was contingent upon the Mellon refinancing and the Mellon refinancing was contingent upon dozens of conditions, the least certain and most important of which was an equity infusion from TCR. TCR had made no commitment to go through with the investment, and, more importantly, the financial numbers coming out of Intershoe in September, October and November of 1991, showed a deteriorating financial condition that would cause serious concern to a potential equity investor. Although there was testimony that supported Mellon's belief that TCR still was considering the transaction into November, 1991, the evidence was persuasive that TCR's participation was sufficiently uncertain that anticipated consummation of the equity investment and ultimately the Intershoe/Mellon transaction should not be the basis for upholding book entries that ultimately turned out to have no basis in reality.[8]
Even in absence of the Committee's testimony that the numbers contained in the audited August 31, 1991, financial statement comply with GAAP and GAAS, courts have concluded that the bankruptcy court is not strictly bound by GAAP and GAAS in its insolvency determinations. See, e.g., In re Parker Steel Co., 149 B.R. 834, 845 (Bankr. N.D.Ohio 1992); In re Sierra Steel, Inc., 96 B.R. 275, 278 (9th Cir. BAP 1989). These same courts have concluded that subsequent events, such as actual collection rates for receivables, that may not technically be cognizable under GAAP and GAAS, may be considered by the bankruptcy judge in insolvency determinations. Parker Steel, 149 B.R. at 845; Coated Sales, 144 B.R. at 668 (stating that "the court may consider information `originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date'") (citation omitted); Sierra Steel, 96 B.R. at 278. Additionally, courts have stated that a contingent asset or liability should be reduced `to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities.' Parker Steel, 149 B.R. at 845 (quoting In re Xonics Photochemical, Inc., 841 F.2d 198, 200 (7th Cir.1988)).
Here the actual rate of realization on Intershoe's assets are dwarfed by its liabilities. Although I acknowledge the "hindsight" nature of this consideration, it merely buttresses the Committee's already-sufficient evidence as to Intershoe's then-present value. The evidence in the case also indicated that, as of August, 1991, prospects were poor for recovery on accounts receivable from Intershoe's affiliates, and there was no credible evidence offered to substantiate the book-entry for alleged credits from Intershoe's suppliers. Even in absence of the testimony that adjustments were warranted by GAAP and GAAS, based upon the evidence, I find it entirely appropriate to make downward adjustments to Intershoe's then-value to write off these alleged assets. Compare In re Worcester Quality Foods, Inc., 152 B.R. 394, 403 (Bankr.D.Mass.1993) (discounting worthless receivables in arriving at insolvency determination); In re Howdeshell of Fort Myers, 55 B.R. 470, 473 (Bankr.M.D.Fla. 1985) (stating that "[i]t has been held that it is not improper to use hindsight gained from success or failure of subsequent collection efforts to evaluate accounts receivable"); In re Chemical Separations Corp., 38 B.R. 890, 895-96 (Bankr.E.D.Tenn.1984).
On the basis of the audited financial statement for August 31, 1991, and the associated testimony, the Committee established by a preponderance of the evidence that Intershoe was insolvent from that date forward.
B. Reasonably equivalent value
To satisfy the final element of the Committee's constructive fraud case, it was required to establish that Mellon did not provide "reasonably equivalent value" for payments it received from Intershoe. The term "reasonably equivalent value" is not defined in the Bankruptcy Code.[9] Courts recently have rejected *465 any fixed mathematical formula for determining reasonably equivalent value and instead have reviewed and considered the totality of the circumstances surrounding the transaction. See Barrett v. Commonwealth Federal Savings and Loan Ass'n, 939 F.2d 20, 23 (3d Cir.1991); see also In re Fairchild Aircraft Corp., 6 F.3d 1119, 1125-26 (5th Cir.1993) (stating that "[a]lthough the minimum quantum necessary to constitute reasonably equivalent value is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value"). Various factors that have been identified as relevant by courts include:
the good faith of the transferee, the relation differences in the amount paid compared to the fair market value, and the percentage of the amount paid is of the fair market value . . . [and] whether the sale was an arm's length transaction between a willing buyer and a willing seller.
In re Chomakos, 170 B.R. 585, 592 (Bankr. E.D.Mich.1993) (quoting In re Morris Communications NC, Inc., 914 F.2d 458, 467 (4th Cir.1990)).
In a usual case, the bankruptcy court can consider a "subsidiary fact finding regarding the value of the property transferred and the `value' received in exchange." In re Besing, 981 F.2d 1488, 1495 (5th Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993). However, the receipt of services has been considered by many courts to constitute value even though the fair value of services may be difficult to measure, Chomakos, 170 B.R. at 590; In re Butcher, 69 B.R. 198, 203 (Bankr.E.D.Tenn.1986), and a number of courts have found that "reasonably equivalent value" need not necessarily be a tangible economic benefit. See Chomakos, 170 B.R. at 595-96 (holding that hotel had provided reasonably equivalent value in exchange for debtor's gambling losses).
Recently, the Third Circuit in Metro Communications, although seeming to require some economic benefit, indicated that a benefit need not be direct to qualify as "reasonably equivalent value" under Section 548(a)(2)(A). In that case, an official committee of unsecured creditors sought, inter alia, to avoid an alleged fraudulent conveyance to a bank which financed a leveraged buyout ("LBO") of a Chapter 11 debtor's stock and received, in return, the debtor's guarantee of repayment and a security interest in the debtor's assets collateralizing the guarantee. In assessing whether the bank gave "reasonably equivalent value" in exchange for the guarantee and security interest, the Third Circuit acknowledged that the debtor corporation, as the target in an LBO, receives no direct benefit in the transaction. Metro Communications, 945 F.2d at 646. However, the Third Circuit determined that "[i]f the consideration [the debtor] received from the transaction, even though indirect, approximates the value it gave [the acquiring corporation], this can satisfy the terms of the statute." Metro Communications, 945 F.2d at 646 (emphasis added). The Court further stated:
[t]hese indirect economic benefits must be measured and then compared to the obligations that the bankrupt incurred. Here, as well as in determining insolvency under section 548(a)(2)(B)(I), it is appropriate to take into account intangible assets not carried on the debtor's balance sheet, including, inter alia, good will. The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred. Thus, when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.
Metro Communications, 945 F.2d at 647 (citations omitted).
In Metro Communications, the Third Circuit found indirect benefits in the debtor's ability to borrow working capital from the bank subsequent to the LBO. It noted that:
[t]he ability to borrow money has considerable value in the commercial world. To quantify that value, however, is difficult. Quantification depends upon the business opportunities the additional credit makes *466 available to the borrowing corporation and on other imponderables in the operation or expansion of its business.
Metro Communications, 945 F.2d at 647. The Third Circuit also concluded that the bankruptcy court had failed to account for value produced by the LBO itself in terms of a "strong synergy" between the debtor and the acquiring corporation. Metro Communications, 945 F.2d at 647.[10]
The Metro Communications decision also may be interpreted as rejecting the totality of the circumstances inquiry in favor of a more narrow inquiry that views the transaction solely from the perspective of creditors. As stated in Metro Communications,
because the fraudulent conveyance laws are intended to protect the debtor's creditors, a lender cannot hide behind the position, although sympathetic, that it has parted with reasonable value. The purpose of the laws is estate preservation; thus, the question whether the debtor received reasonable value must be determined from the standpoint of the creditors.
Metro Communications, 945 F.2d at 646 (emphasis in original). However, less than three months prior to the issuance of the Metro Communications opinion the Third Circuit endorsed the parties' application of the totality of the circumstances inquiry in Barrett, 939 F.2d at 23-24. Notably, the Metro Communications panel did not discuss or explicitly reject consideration of the totality of the circumstances. I read Metro Communications, therefore, as endorsing the creditors' interests and the conferral of tangible economic value as important considerations among the circumstances to be considered in assessing reasonable equivalent value. I do not read the opinion as foreclosing other considerations such as the good faith of the transferee, the arm's length nature of the transaction and society's interest in maintaining the integrity of commercial transactions.
Indeed, in cases in which tangible economic benefit is present but difficult to ascertain or measure, circumstances surrounding the transfer which do not directly establish the value of the benefit may nevertheless provide important insight into the value of the benefit. For example, in The Official Committee of Unsecured Creditors of R.M.L., Inc. v. Zolfo, Cooper & Co., No. 1-92-00293, slip op., 1995 WL 711045 (Bankr. M.D.Pa. Jan. 27, 1995), the issue before me was whether Intershoe received reasonably equivalent value in exchange for hundreds of thousands of dollars it paid a financial consulting firm during the period in which Intershoe's financial condition continued to deteriorate. Although Intershoe's financial condition did not stabilize or improve during the relevant period, all parties, including the Committee's own rebuttal expert, agreed that the firm's consulting services had rendered value; however, the value was difficult to quantify. In light of the totality of the circumstances, I determined that the best measure of the value of the consulting firm's services was the price Intershoe would have had to pay to go into the open market and obtain similar services.
To summarize the foregoing, I must review the totality of the circumstances of the instant case, giving due and weighty consideration to the perspective of Intershoe's creditors, to determine whether Mellon rendered reasonably equivalent value in exchange for each of the three transfers from Intershoe. To constitute reasonably equivalent value, such benefit need not be the exact equivalent to the amount of the transfers and may be indirect in nature.

1. The August 12, 1991, $125,000.00 transfer

Intershoe's first transfer of $125,000.00 to Mellon was made pursuant to the August 9, 1991, proposal letter, which provided for a "good faith deposit" in that amount to cover Mellon's "out-of-pocket expenses." The Committee's evidence indicates that, in light of the failure of the Intershoe/Mellon loan to close and the failure of Intershoe's financial condition to stabilize or improve *467 subsequent to the date of the transfer, no reasonably equivalent value was conferred in exchange for the $125,000.00. Mellon contends not only that its expenses were necessary and reasonable, but that its proposal, due diligence and commitment subsequent to the initial $125,000.00 transfer conferred benefit on Intershoe by: 1) encouraging trade suppliers to extend unsecured credit to Intershoe; and 2) encouraging the Signet Group to extend its loan facility with Intershoe during the relevant time period.
Considering Mellon's contentions first, the evidence was persuasive that Mellon's involvement in pursuing a loan transaction with Intershoe was a factor in the continuing extensions of credit from trade suppliers and the Signet Group, though not the sole or principal factor and not as weighty a factor as Mellon would like me to conclude. With regard to the trade suppliers, according to Mellon's own evidence, Intershoe accrued more than $10 million in unsecured debt to the trade creditors during the period when Mellon was performing its due diligence; from their perspective this can hardly be deemed a benefit.[11] Additionally, Mellon presented little direct evidence that its dealings with Intershoe were an important factor in continued extensions of credit from the trade suppliers; other significant reasons existed for continued extensions of credit, including the fact that many of Intershoe's suppliers were sole source suppliers dependent upon Intershoe to distribute their products. Notably the trade suppliers extended credit to Intershoe before Mellon's proposal and after the Intershoe/Mellon deal was dead.
With regard to the alleged benefit related to the Signet Group financing, I also conclude that Mellon's dealings with Intershoe were a factor but neither the sole nor principal factor. The first extension by the Signet Group occurred in February, 1991, long before any proposal or commitment was issued by Mellon. The second extension occurred on September 29, 1991, prior to Mellon's commitment  this was the time period in which Intershoe was paying the Signet Group millions of dollars at the expense of its trade suppliers. There appears, therefore, to have been significant incentive for the Signet Group to support Intershoe as a going concern exclusive of any interest by Mellon in the refinancing. Even after Mellon withdrew its commitment, the Signet Group agreed to extend its credit facility, lending credence to the Committee's position that the Signet Group would have extended its loan facility regardless of Mellon's involvement.
The Committee's evidence that no benefit was conferred is simple and accessible yet is quite powerful in its simplicity. The Mellon loan never closed; therefore the primary anticipated source of value from the transaction failed. Additionally, during the period Mellon was actively involved, Intershoe's going concern value did not stabilize or increase; rather, it deteriorated. Compare Metro Communications, 945 F.2d at 647 (stating that "when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received").
Other factors are relevant, however. Mellon established a valid contractual basis for retention of the $125,000.00. The August 9, 1991, proposal letter provides for a good faith deposit in that amount and Mellon established to my satisfaction that such agreement was of an ordinary commercial nature and that Mellon actually and reasonably incurred out-of-pocket expenses through the cessation of its takedown examination in excess of the $125,000.00 deposit such as warranted retention of the deposit under the agreement.[12] The contractual nature of this *468 relationship is entitled to some degree of respect in the balancing. Additionally, the parties' agreement was made in the government-regulated arena of HLT transactions and in an open and competitive marketplace; the evidence indicated that the parties were at arm's-length at the time the proposal was issued and accepted. Finally, a three month period passed between the transfer of the initial $125,000.00 and the termination of the proposed transaction; there was adequate time for some degree of the types of indirect benefit alleged by Mellon to accrue with respect to this initial transfer.
In the Zolfo Cooper case, discussed above, I was confronted with an analogous circumstance in which some degree of benefit was conferred on Intershoe in a commercial relationship, but the amount of that benefit was quite difficult of ascertainment. Under the totality of the existing circumstances, I found the best measure of that value to be the price Intershoe would have had to pay in the open market for similar services.
In the instant case, I also find there to have been a degree of value conferred on Intershoe by Mellon's pursuit of the loan transaction. Here, as in Zolfo Cooper, the economic value of that benefit is quite difficult of ascertainment. As an additional complicating factor, due to the unique nature of the transaction and the circumstances associated with it, information on the market value of Mellon's actual costs is not readily available.[13] Under the circumstances of the case, I find that the parties' initial August 9, 1991, agreement and Mellon's proofs as to the reasonableness of the out-of-pocket expenses incurred thereunder provides the best available evidence of the value of Mellon's contribution. The value conferred, $127,538.04, exceeds the transfer; therefore, Mellon will prevail with regard to the initial deposit amount.[14]

2. The October 8 1991, $125,000.00 transfer

The $125,000.00 transfer made from Intershoe to Mellon on or about October 8, 1991, stands on entirely different footing than the initial transfer. The transfer was described in the testimony as an additional good faith deposit; however, the August 9, 1991, proposal letter does not specifically provide for a second deposit and no document was introduced into evidence to substantiate the request. Moreover, Mellon was able to substantiate only $127,538.04 in out-of-pocket expenses through the date of termination of the proposed transaction in mid- to late November; therefore, under the contractual terms of the August 9, 1991, proposal letter, Intershoe would have been entitled to a return of $122,461.96 ($250,000.00 in deposits minus the $127,538.04).[15]
It was not until Intershoe executed the November 7, 1991, commitment letter, which provides among its terms for the retention by Mellon of all deposits if the transaction failed to close, that Mellon obtained a contractual right to retain the second deposit in its entirety. Put another way, on November 7, 1991, Intershoe transferred its right to a *469 return of the bulk of the second deposit. Therefore, with regard to the $122,461.96, I find the relevant date of transfer to be November 7th.
To complete the analysis, I must assess the benefit Mellon conferred upon Intershoe subsequent to November 7, 1991. Mellon issued a highly-conditional commitment, which, inter alia, was contingent upon an equity injection of $15 million. Mellon asserts that the commitment had significant value; the Committee contends it had none. In reaching my determination as to Intershoe's insolvency, I discussed the uncertainty associated with the equity investor's prospective participation  TCR had made no commitment to participate in the transaction and Intershoe's deteriorating financial condition was a deterrent to an equity investor. The evidence then indicates that the conditional nature of Mellon's commitment decreased its value dramatically. In addition, there was a very short window of time during which the loan commitment was alive in which indirect benefit could accrue. There was no evidence of the amount of credit trade suppliers extended during that short period and the Signet Group did not then agree to further extend the credit facility to which it had already committed.
Mellon attempted to justify retention of the $122,461.96 by arguing that the exorbitant amount of time devoted by its officers and employees to the transaction was of value to Intershoe and the amounts of their salaries, bonuses, stock options and other compensation can be viewed as a measure of the value of the benefit Mellon conferred on Intershoe. Similarly, Mellon seeks to advance its lost opportunity costs as another item to be considered in determining value to Intershoe.
I note first that a large portion these costs were incurred prior to November 7, 1991, when Intershoe transferred its right to a return of the $122,461.96. Second, although I believe that Mellon's internal costs are relevant in the totality of the circumstances, I do not feel that they must be accorded great weight. From the creditors' perspective espoused in Metro Communications, it mattered little how much time Mellon's people spent on the transaction; what would have been important would have been a firm and less conditional commitment.[16] Additionally, credible testimony at trial indicated that internal costs are not normally factored into loan transactions exclusive of facility-type fees; therefore there is no commercial basis independent of the November 7th agreement for retention of the $122,461.96. By November 7th, the arm's-length nature of Intershoe's relationship with Mellon had disintegrated; Intershoe's financial condition had deteriorated and the Mellon loan appeared to be one of few if not the only remaining option Intershoe had to survive as a going concern. Mellon, then, had the opportunity to extract fees not ordinarily warranted on a arm's length commercial basis.[17]
Excluding Mellon's internal associated costs, and given the absence of an equity investor commitment to the transaction, the dependency of Mellon's commitment on participation of an equity investor, and Intershoe's precarious and deteriorating financial condition, it is extremely difficult to conclude that Mellon's conditional commitment had a great deal of value. Based upon the totality of the circumstances, the Committee has established that Mellon failed to confer reasonably equivalent value in exchange for the $122,461.96.[18]

*470 3. The November 7, 1991, $265,000.00 transfer

Intershoe's transfer on November 7, 1991, of $265,000.00 entails most of the same circumstances as Intershoe's surrender of its right to a return of the $122,461.96: 1) the transfers occurred on the same date; 2) both transfers were made in exchange for a highly conditional loan commitment, and all parties should have known there was a substantial probability that the loan would not close; 3) both transfers occurred at a time when Intershoe was in a poor bargaining position; and 4) the proposed loan transaction disintegrated shortly after both transfers. The principal difference between the two transfers is that Mellon did proffer credible evidence at trial that a non-refundable commitment fee of $265,000.00 was commensurate with fees charged in the banking industry for the type and scale of the loan at issue.
Weighing this distinguishing factor in the totality of the circumstances, I still do not find reasonably equivalent value provided. The commercial "ordinariness" of the transfer to a degree alleviates the concern about whether the transfer was arm's length but does not eliminate it. It is doubtful that Intershoe under arm's length circumstances would have executed a commitment letter requiring the payment of $387,461.96 in fees and conditioned upon a $15 million equity investment without a firm and written commitment from the investor. Additionally, I find that the remaining factors discussed in the section above outweigh the consideration of the "ordinariness" associated with the amount and non-refundable nature of the fee, including the doubtful value of the highly-conditional commitment and its short-lived existence. In the terms of the Metro Communications court, Intershoe's creditors benefitted little from Mellon's highly conditional commitment which was rendered worthless within a short time after its issuance. Based upon the totality of the circumstances with due and weighty consideration to the creditors' perspective, I find the Committee has met its burden of establishing that Mellon failed to confer reasonably equivalent value in exchange for the $265,000.00 transfer.
C. Good faith and the integrity of commercial transactions
In the Chomakos case, cited by Mellon, the bankruptcy court held that a gambling casino conferred reasonably equivalent value in exchange for a net $7,700.00 loss gambling. The bankruptcy court specifically limited its holding to the facts before it, stating:
[o]ne could readily conjure up a situation where a "high roller" whose financial situation is well known, gambles at a casino one or two times shortly before filing bankruptcy and loses an inordinately large amount of money. That factual situation, or something much more akin to it then (sic) this one, contains the seeds of a possibly different result.
Chomakos, 170 B.R. at 596. As persuasively argued by the Committee, the facts of the case before me are much more akin to the "high roller" analogy than to the specific facts before the Chomakos court and the case is therefore of limited direct relevance.
The Chomakos decision, however, is noteworthy because of the court's thoughtful discussion of its concern about chilling commercial relationships with parties who are financially troubled. Many commercial relationships contain benefits to parties that are difficult if not impossible to measure or ascertain, and the Chomakos court questioned whether Section 548 was intended to sweep such transactions within its reach. The Chomakos court apparently concluded that, in appropriate circumstances, the court may consider the ordinary commercial nature of the parties' relationship as an important factor in its totality of the circumstances analysis. See also In re Fairchild Aircraft Corp., 6 F.3d 1119, 1126-27 (5th Cir.1993).[19]
*471 With due respect for the Third Circuit's decision in Metro Communications, I have tried to incorporate an element of the Chomakos court's reasoning into my analysis of the facts of this case, and I too express a concern for preserving parties' confidence in ordinary commercial relationships. The result in this case seems to be the most appropriate balance possible under the circumstances: Mellon receives full payment of its reasonable and necessary out-of-pocket costs contractually provided in its proposal; however, it does not receive payment of fees associated with the granting of a highly conditional loan commitment on the eve of disintegration of the entire transaction. The decision should do nothing to discourage lenders from proceeding forward in good faith with risk-involved transactions to the point of commitment; though, in order to obtain fees associated with actual commitment, they may wish to assure that their loan commitments are not illusory.
D. Pre-judgment interest
The Committee also seeks an award of prejudgment interest. Most courts have found that bankruptcy courts have the discretion to award prejudgment interest in a fraudulent conveyance action. See, e.g., In re FBN Food Services, Inc., 175 B.R. 671, 690 (Bankr.N.D.Ill.1994). Under the equities of this case, which include the amount of the judgment being rendered in favor of the Committee, Mellon's substantial losses associated with the transaction including lost business opportunities and time, and my finding of an absence of intentional bad faith on Mellon's part, I have decided not to make the additional award of prejudgment interest.

Conclusions of law
1. I have jurisdiction over the instant adversary proceeding pursuant to Sections 157 and 1334 of the Judicial Code. Pursuant to Section 157(b)(2)(H), this is a core proceeding.
2. Intershoe had an interest in transfers to Mellon totaling $515,000.00 which were made within the one year preceding Intershoe's bankruptcy filing.
3. At all times relevant to this adversary proceeding, Intershoe was insolvent.
4. The Committee failed to establish by a preponderance of the evidence that Intershoe did not receive from Mellon the reasonably equivalent value of the $127,538.04 in reimbursement for out-of-pocket expenses paid to Mellon.
5. The Committee established by a preponderance of the evidence that Intershoe did not receive reasonably equivalent value in exchange for $387,461.96 in fees paid to Mellon.
6. Pursuant to Section 548 and 550 of the Bankruptcy Code, the Committee is entitled to judgment in the amount of $387,461.96.
7. The equities of the case do not favor an award of prejudgment interest.
NOTES
[1] Unlike commercial or real estate loans, an asset-based loan is granted against a borrower's accounts receivable and inventory, which requires extensive analysis of, inter alia, the borrower's accounts receivable, inventory, business plan, historical financial statements and projections. An analysis and verification of whether the borrower will be able to generate sufficient cash flow to service the debt and pay down the loan is required.
[2] Intershoe's monthly financial statement for October, 1991, indicated a loss for the two months ending October 31, 1991, in the amount of $4,132,934.00. By the end of October, 1991, Intershoe's liabilities exceeded its assets by $8,187,903.00.
[3] If the loan had closed, Intershoe would have been required to pay an additional sum of $265,000.00, one-half of which represented the facility fee that remained due to Mellon and the other half to be paid to the other loan participants.
[4] Mellon's own commitment letter seems to recognize the problems with IS International and Intershoe's other affiliates, as it requires consolidation of the affiliates, which according to the evidence would have had the effect of eliminating the receivables owed by those companies and would have provided Intershoe with little value in return.
[5] Even though Peat Marwick opined upon the 1991 financial statement, it was Intershoe's decision to make the write-offs and adjustments actually made to the financial statement.
[6] While the seasonality of Intershoe's business accounted for a degree of the losses in the Fall of 1991, the actual losses sustained were much higher than expected.
[7] Since March, 1992, the gross amount collected from the liquidation of Intershoe's inventory and receivables has been $41,871,000.00. It is believed that the net amount realized after payment of collection costs and commission will be approximately $34.5 million.
[8] Such unsupported entries include: Intershoe's uncollectible accounts owed by IS International; the alleged credit from Intershoe's suppliers; and the treatment as an asset of the three-quarter million dollars Intershoe spent to pursue the proposed Intershoe/Mellon transaction.
[9] Of the three words, only the last is defined. Pursuant to Section 548(d)(2)(A), "value" means "property, or satisfaction or securing of a present or antecedent debt of the debtor."
[10] The Third Circuit also found that, in valuing the cost of the debtor's guarantee, the right to contribution from co-guarantors needed to be balanced against the debt for which the debtor was liable. Id. at 648.
[11] From the perspective of the secured creditor, the Signet Group, however, this may very well have been a great benefit. While Intershoe was incurring trade debt, in made corresponding payments on its bank debt, reducing it by approximately $10 million.
[12] The Committee contends that Mellon's claimed expenses were inflated and unreasonable; however, I accept and here adopt Mellon's evidence concerning the reasonableness of the $127,538.04 in out-of-pocket charges. I found the Committee's comparisons of the Mellon transaction to other proposed loan transactions to be flawed, both because of differences in the other transactions and because most of the other transactions never reached the point of commitment and takedown examination; they stopped short at whatever point the bank determined it would not extend the credit on the requested basis. I also found the Committee's contention that Mellon's European due diligence trip was a "junket" or "boondoggle" to have been wholly without credible support. Given the amount of the proposed loan and the risk associated with it, it appears to me that the visit to Intershoe's facilities abroad and to the supplier facilities was entirely justified.
[13] As previously stated, I reject the Committee's contention that other bank transactions evidenced in this case were sufficiently similar in nature and development to serve as a basis for comparison to the costs Mellon incurred.
[14] I note that the August 12th transfer was the only transfer prior to August 31, 1991, the benchmark date for Intershoe's audited financial statements. Given my ruling with regard to this transfer, there was no need to extrapolate to August 12th to find insolvency on that date, although based upon the evidence, I would have no trouble doing so.
[15] Although the August 9, 1991, proposal letter does not specifically provide for return of unused good faith deposits under the circumstances that unfolded in this case, neither does it provide for retention under those circumstances. Given the nature of the transfer as a "deposit" and the Committee's testimony regarding ordinary banking practices, I find as a matter of contract interpretation that unused deposits should have been returned under the terms of the August 9 agreement and in absence of subsequent agreement.
[16] Mellon's internal costs are different from the fees of the financial consultant in Zolfo Cooper, where the financial consulting firm's efforts were expended directly in the attempt to restructure and manage Intershoe.
[17] The Committee sought at trial to establish that Mellon knew by early November 1991, that the loan to Intershoe was not going to close, and it therefore issued its commitment letter with conditions impossible to meet solely to extract fees from Intershoe. I have not gone that far in my factual findings; however, I do find that Mellon had ample reason to believe there was a significant possibility that Intershoe could not meet one or more of the conditions of the commitment letter, including the TCR equity investment.
[18] With regard to $2,538.04 of the second $125,000.00 deposit, I find that Mellon did confer reasonably equivalent value. Intershoe's initial deposit was $125,000.00 and Mellon's actual out-of-pockets were $127,538.04; the $2,538.04 covers the remainder of Mellon's out-of-pockets and should be retained by Mellon for the reasons stated in my discussion of the initial $125,000.00 deposit.
[19] Although I found the discussion in the Fairchild case, also cited by Mellon, to be relevant to this case, I found the facts distinguishable in that the court in Fairchild identified "several immediate benefits" to the debtor related to the transfers at issue. See Fairchild, 6 F.3d at 1126. Based upon my findings, I do not agree that similar immediate benefits are present in the case before me.